TRANSITIONAL HOSPITALS CORPO-
RATION OF LOUISIANA, INCORPO-
RATED, and Transitional Hospitals
Corporation of Texas, Incorporated,
Appellees,

v.

Donna E. SHALALA, Secretary, De-
partment of Health and Human
Services, Appellant.

No. 99–5166.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 24, 2000.

Decided Aug. 22, 2000.

Anne M. Murphy, Attorney, U.S. Department of Justice, argued the cause for appellant. With her on the brief were David W. Ogden, Acting Assistant Attorney General, Anthony J. Steinmeyer, Assistant Director, and Wilma A. Lewis, U.S. Attorney.

Eugene Tillman argued the cause for appellees. With him on the brief was Tamara V. Scoville.

Before: WILLIAMS, ROGERS, and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge GARLAND.

GARLAND, Circuit Judge:

The Medicare program reimburses certain categories of hospitals on a "reasonable cost" basis, rather than under the generally applicable, and less remunerative, "Prospective Payment System." Long-term care hospitals are one such category. Plaintiffs own two new facilities for which they sought classification as long-term care hospitals before they began admitting patients. The Department of Health and Human Services (HHS) rejected plaintiffs' request, citing regulations that require new hospitals to have six months of experience before they can qualify as "long-term." In enacting those regulations, the Secretary of HHS took the position that an initial data-collection period is statutorily required. Plaintiffs, challenging the regulations in the district court, took the opposite position: that the

Medicare statute does not mandate an initial data-collection period and in fact manifestly requires HHS to reimburse them as long-term hospitals from the first day of operation. The district court agreed with plaintiffs and declared HHS' regulations invalid.

We do not find the statute as clear as either side suggests, but rather conclude that Congress intended the Secretary to exercise discretion in determining the manner in which a hospital qualifies as a long-term care facility. We therefore reverse the decision of the district court. However, because the Secretary mistakenly believed that she lacked such discretion, we remand the case to permit her to determine whether she wishes to retain the existing regulations knowing that other options are permissible.

**I**

Medicare is a federal health insurance program for the aged and disabled that is administered by the Health Care Financing Administration (HCFA) of HHS. *See* 42 U.S.C. §§ 1395 *et seq.* Under Medicare Part A, institutional health care providers are reimbursed for their services to eligible patients. *See id.* §§ 1395c to 1395i–5. From its inception until 1983, Medicare reimbursed hospitals for the "reasonable cost" of providing inpatient care, subject to certain limitations. *Id.* § 1395f(b) (1982); *see also id.* § 1395x(v).

By 1983, Congress had become concerned that hospitals reimbursed on a reasonable cost basis lacked incentives to operate efficiently. This concern led to the revision of the Medicare payment system in that year. *See* Social Security Amendments of 1983, Pub.L. No. 98–21, § 601, 97 Stat. 65, 149. *See generally County of Los Angeles v. Shalala,* 192 F.3d 1005, 1008–09

(D.C.Cir.1999). In place of the reasonable cost method, Congress enacted the Prospective Payment System (PPS) as the principal method of compensating hospitals for inpatient care provided to eligible patients. Under PPS, hospitals are reimbursed according to flat rates established in advance for the various categories of patient diagnoses (known as "diagnosis-related groups" or "DRGs"). 42 U.S.C. § 1395ww(d). The rates reflect the average cost associated with treating a patient for a specific condition, and encourage hospitals to keep costs within the anticipated reimbursement levels. For the care of patients whose hospitalizations are extraordinarily costly or lengthy, the statute authorizes the Secretary to make "outlier payments" to supplement the standard PPS disbursement. *Id.* § 1395ww(d)(5)(A)(i)–(vi); *see County of Los Angeles,* 192 F.3d at 1009.

Because PPS was "developed for short-term acute care general hospitals," Congress acknowledged that it did not "adequately take into account special circumstances of diagnoses requiring long stays." S. REP. No. 98–23, at 54 (1983), U.S. Code Cong. & Admin. News at 143, 194. Thus, Congress altogether excluded from PPS certain types of hospitals that treat atypical patient populations. These hospitals instead receive reimbursement for inpatient care under the reasonable cost system. *See* 42 U.S.C. § 1395ww(d)(1)(B). One type of hospital subject to the statutory exclusion is a long-term care hospital, which the statute describes as "a hospital which has an average inpatient length of stay (as determined by the Secretary) of greater than 25 days." *Id.* § 1395ww(d)(1)(B)(iv)(I).[1] The availability

---

1. The statute lists the following types of excluded hospitals:
   (i) a psychiatric hospital (as defined in section 1395x(f) of this title),
   (ii) a rehabilitation hospital (as defined by the Secretary),
   (iii) a hospital whose inpatients are predominantly individuals under 18 years of age,
   (iv)(I) a hospital which has an average inpatient length of stay (as determined by the Secretary) of greater than 25 days ...

. . . . .

   (v)(I) a hospital that the Secretary has classified ... for purposes of applying exceptions and adjustments to payment amounts under this subsection, as a hospital involved extensively in treatment for or research on cancer....

42 U.S.C. § 1395ww(d)(1)(B).

of this exclusion is the central issue in the case before us.

## A

HHS implemented the new PPS reimbursement scheme by enacting regulations in 1984. In issuing its final rule, although not in the rule itself, HHS announced that it intended to apply the statutory exclusions prospectively only: any change in a hospital's status (i.e., whether it was subject to or excluded from PPS) that occurred during one cost reporting period would generally take effect only at the start of the next period, with each period typically lasting one year. *See Medicare Program; Prospective Payment for Medicare Inpatient Hospital Services,* 49 Fed. Reg. 234, 243 (1984). Thus, a new hospital would not qualify for the exclusion at least until the initial reporting period was over. To accommodate new hospitals, HHS permitted an abbreviated initial cost reporting period of six months, rather than the usual one year. *See* 42 C.F.R. § 405.471(c)(5)(i), (c)(5)(ii)(B) (1983), *now codified at* 42 C.F.R. § 412.23(e)(1), (e)(3)(ii).[2]

In 1992, HHS formalized its prospective approach to exclusions by proposing and then adopting the following rule:

> For purposes of exclusion from the prospective payment systems . . ., the status of each currently participating hospital . . . is determined at the beginning of each cost reporting period and is effective for the entire cost reporting period. Any changes in the status of the hospital are made only at the start of a cost reporting period.

42 C.F.R. § 412.22(d). Thus, a hospital that qualifies for the exclusion in the middle of a reporting period will not benefit until the next reporting period. By the same token, a hospital that ceases to qualify in the midst of a cost reporting period will nevertheless be compensated as though it were exempt for the entire period. *See Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 1993 Rates,* 57 Fed.Reg. 23,618, 23,657 (1992). For a new hospital, HHS' rule confirmed that the exclusion does not begin until the first six months of data collection have passed.

In response to the notice of proposed rulemaking, the National Association of Long Term Hospitals (NALTH) suggested that HHS permit new long-term care hospitals to self-certify their average length of stay from the start. See Letter from NALTH to HCFA at 2 (July 31, 1992) (J.A. at 53) [hereinafter NALTH Ltr.].[3] HHS, however, concluded that it did not have the discretion to permit self-certification by long-term care hospitals. "We do not believe that the statute permits us," the Department said, "to extend the exclusion for long-term care hospitals to a hospital which has not demonstrated actual compliance with the statutory requirement." Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 1993 Rates, 57 Fed.Reg. 39,746, 39,800–01 (1992) [hereinafter Final Rule]. The "criterion for exclusion as a long-term care hospital (average inpatient length of stay greater than 25 days) can be assessed only over a period of time. Thus, a hospital cannot qualify as a long-term care hospital until it has been in operation for some period of time." Id. at 38,801.

## B

Plaintiffs Transitional Hospitals Corporation of Louisiana and Transitional Hospi-

---

**2.** The regulations permit hospitals that experience a change in their average length of stay to establish exclusion eligibility by having an average length of stay greater than 25 days for the immediately preceding six month period. *See* 42 C.F.R. § 405.471(c)(5)(i), (c)(5)(ii)(B) (1983), *now codified at* 42 C.F.R. § 412.23(e)(1), (e)(3)(ii). According to HHS, a new hospital that treats patients with an average length of stay greater than 25 days

"will always experience [a] change in length of stay because its initial length of stay is zero inpatient days." HHS Br. at 9 n.5.

**3.** NALTH noted that HHS permits new rehabilitation hospitals to self-certify that their inpatient populations meet the exclusion criteria for that category. *See* NALTH Ltr. at 1–2 (J.A. at 52–53); discussion *infra* Part III.

tals Corporation of Texas (hereinafter "the THC plaintiffs") opened two new hospitals at the end of 1992. Both were intended to treat patients with medically complex conditions requiring extended inpatient stays, thereby qualifying for the long-term care hospital exclusion from PPS. Before commencing operations, the THC plaintiffs wrote HCFA stating that they "only expect to admit patients whose medical conditions will result in lengths of stay in excess of 25 days." Letter from Counsel for THC to HCFA at 2 (Nov. 12, 1992) (J.A. at 57) [hereinafter THC Ltr.]. They asked HCFA to exclude them from PPS from the starting date of their Medicare provider agreements, rather than reimburse them under PPS during their first six months of operation. *See id.* at 4 (J.A. at 59).

Kathleen Buto, the Director of HCFA's Bureau of Policy Development, wrote back denying plaintiffs' request. Buto said that the statute mandates exclusion only for "a hospital which *has* [emphasis added] an average length of stay (as determined by the Secretary) of greater than 25 days." Letter from HCFA to Counsel for THC at 2 (Dec. 24, 1992) (J.A. at 63) (alteration and emphasis in original) [hereinafter Buto Ltr.]. Noting that HHS regulations implement that mandate by "examining [a hospital's] actual operating experience in a past period, rather than by relying on its admission criteria or other formalized statements of how the hospital is intended or expected to operate," Buto concluded that the THC plaintiffs could not qualify for the exclusion in advance. *Id.* at 2–3 (J.A. at 63–64).

Having had their request turned down, the THC plaintiffs proceeded with the six-month cost reporting period. During that time, they were reimbursed under PPS, supplemented by outlier payments. At the end of the six-month period, both hospitals demonstrated average inpatient lengths of stay exceeding 25 days, thereby qualifying for exclusion from PPS—and entitling them to payment for "reasonable costs"— during the next cost reporting period. *See* Linville Aff. ¶¶ 7, 8, 13 (J.A. at 35, 37).

Plaintiffs estimate that their PPS reimbursement during the initial six-month period was approximately $1.2 million per hospital less than it would have been under the reasonable cost standard. *See id.* ¶¶ 11, 12 (J.A. at 36).

The THC plaintiffs requested a hearing before the Provider Reimbursement Review Board, which is authorized by statute to hear the complaints of providers dissatisfied with the compensation they have received. *See* 42 U.S.C. § 1395*oo*(a), (d). Plaintiffs challenged the validity of the regulations that denied them compensation for reasonable costs during their first months of operation. The Board, however, concluded that it lacked authority to determine the validity of HHS regulations.

Plaintiffs then brought suit in the United States District Court for the District of Columbia. Ruling on the parties' cross motions for summary judgment, the court concluded that the Medicare statute was neither silent nor ambiguous on the question. Rather, the court concluded that the statute unambiguously requires HHS to provide a PPS exclusion from the beginning of a new long-term care hospital's participation in the Medicare program. The court further held that even if the statute were ambiguous, the Secretary's regulations did not constitute a permissible interpretation of the legislative language. The court therefore declared the regulations invalid insofar as they preclude new long-term care hospitals from securing immediate exclusion from PPS. *See Transitional Hosps. Corp. v. Shalala,* 40 F.Supp.2d 6, 15 (D.D.C.1999). This appeal by the Secretary followed.

**II**

We review de novo the district court's ruling on the motions for summary judgment. *See United Seniors Ass'n v. Shalala,* 182 F.3d 965, 969 (D.C.Cir.1999). In judging the validity of the Secretary's regulations, we apply the familiar two-step framework of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467

U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). We first ask "whether Congress has directly spoken to the precise question at issue," in which case we "must give effect to the unambiguously expressed intent of Congress." *Id.* If the "statute is silent or ambiguous with respect to the specific issue," we move to the second step and defer to the agency's interpretation as long as it is "based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778. However, deference is "only appropriate when the agency has exercised its *own* judgment." *Phillips Petroleum Co. v. FERC*, 792 F.2d 1165, 1169 (D.C.Cir.1986). "When, instead, the agency's decision is based on an erroneous view of the law, its decision cannot stand." *Id.*

**A**

◼ We begin with *Chevron* step one, and with the Secretary's contention that Congress unambiguously expressed its intent to bar the relief plaintiffs request.

The statutory provision at issue is quite brief. It excludes from PPS any "hospital which has an average inpatient length of stay (as determined by the Secretary) of greater than 25 days." 42 U.S.C. § 1395ww(d)(1)(B)(iv).[4] When the Secretary adopted her implementing regulations, she took the position that the statute does not permit her to certify a hospital as long-term in advance because the criterion for exclusion, an average inpatient length of stay greater than 25 days, "can be assessed only over a period of time." *Final Rule*, 57 Fed.Reg. at 39,801. "Thus," she said, "a hospital cannot qualify as a long-term care hospital until it has been in operation for some period of time." *Id.* Similarly, when HCFA turned down plaintiffs' request for self-certification, it stressed that, because under the statute only a hospital that "has" the requisite

length of stay is eligible, a hospital cannot qualify until it makes the requisite showing that it "has" that average length of stay. *See* Buto Ltr. at 2 (J.A. at 63).

The statute seems neither so clear, nor so dictatorial, to us. Although it does establish a criterion based on average length of stay, the statute is silent as to how and when that length should be calculated. Nothing in the language precludes the Secretary from determining length of stay based on a prediction drawn, as plaintiffs suggest here, from a hospital's policy of admitting only "patients whose medical conditions will result in lengths of stay in excess of 25 days." THC Ltr. at 2 (J.A. at 57); *cf. County of Los Angeles*, 192 F.3d at 1013–15 (affirming HHS' use of predictions to determine statutorily-mandated range of outlier payments).

Nor does the statute's use of the present tense verb "has" definitively resolve the question. Although to qualify it must be true that a hospital "has" the requisite length of stay, that word does not tell us how to determine whether that state of being exists. The agency has implicitly recognized as much by adopting a policy of determining a hospital's status at the beginning of a cost reporting period, and then permitting it to retain that status for the entire period—even if conditions change in the interim. *See* 42 C.F.R. § 412.22(d). Under this policy, HHS excludes a hospital for the next period based on data derived from the prior period, regardless of whether the hospital actually "has" the requisite average on each day of the next period. *See id.*

Moreover, nothing in the statutory language precludes an alternative form of relief requested by plaintiffs: retroactive reimbursement for reasonable costs incurred during the first six months if, at the

---

4. Neither side makes an argument based on legislative history. The PPS exclusion was passed as part of a large bill enacting wholesale changes in the Medicare program, and specific references to the long-term care exclusion occur only in general passages explaining the need for a reasonable costs alternative to PPS for certain types of hospitals. *See, e.g.,* H.R. Conf. Rep No. 98–47, at 192–93 (1983); S.Rep. No. 98–23, at 53–55 (1983); H.R.Rep. No.98–25, at 8–9, 141–42 (1983).

end of that period, the hospital shows that it had a 25–day average during that period. Again, the word "has" does not unambiguously decide this question. Each of plaintiffs' hospitals could have accurately said on its six-month anniversary that today it "has" a greater than 25–day average—referring to the entire period from day one through and including day 180. It would therefore have been consistent with the literal language to reimburse the hospital on that day for all of its reasonable costs incurred to date.

■ Finally, and perhaps most important, this is not a statute as to which we can only infer, from Congress' silence, an implicit intent to delegate to the Secretary the authority to reasonably interpret the statutory terms. See Chevron, 467 U.S. at 844, 104 S.Ct. 2778. Rather, in this case the statute excludes a hospital that has an average length of stay of greater than 25 days, "as determined by the Secretary." 42 U.S.C. § 1395ww(d)(1)(B)(iv). Thus, Congress has provided "an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." Chevron, 467 U.S. at 843–44, 104 S.Ct. 2778; see also 42 U.S.C. §§ 1302(a), 1395hh(a) (granting HHS authority to issue regulations to administer Medicare program). This means that the Secretary has discretion to determine how to calculate the qualifying length of stay, and that we are bound to uphold her determination as long as she exercises that discretion in a reasonable way. See Chevron, 467 U.S. at 843–44, 104 S.Ct. 2778.

**B**

■ The THC plaintiffs also see the statute as clear and unambiguous—although in precisely the opposite way as that perceived by HHS. In their view, and in the view of the district court, the use of the present tense "has" requires

that if during any given period the hospital "has" a 25–day average, it must be considered exempt for the entire period. See THC Br. at 22–23. The use of the present tense, plaintiffs contend, requires that the exclusion "be applied on a *current* basis," and "allows no alternative temporal reading." *Id.* Or, as the district court put it, "the plain language of the statute indicates that a long-term care hospital may obtain an exemption from the Prospective Payment System whenever it 'has' an average inpatient length of stay greater than 25 days." *Transitional Hosps.,* 40 F.Supp.2d at 10.[5]

Again we disagree, this time for the mirror image of our reasoning with respect to HHS' interpretation. Because the statute does not tell us how to determine whether a hospital "has" the required average length of stay, it cannot be read as requiring the agency to make that determination constantly and instantaneously—any more than it can be read (as HHS would have it) as requiring the agency to make that determination prospectively only. In *Methodist Hospital v. Shalala,* 38 F.3d 1225 (D.C.Cir.1994), we considered a similar argument regarding the wage index used to determine reimbursement rates under PPS. In that case, the plaintiff hospitals contended that the Medicare statute required retroactive application of corrections made to the index to ensure that the Secretary was not employing an incorrect index in the period prior to the next correction. We rejected that claim, noting that it "would require the Secretary to make virtually continuous adjustments in the wage index." *Id.* at 1230. "The statute," we said, "does not specify how the Secretary should construct the index, nor how often she must revise it.... Congress through its silence delegated

---

5. Plaintiffs also proffer an argument they describe as based on statutory purpose, contending that they are entitled to an exemption from their first day of operation because Congress' exclusion of long-term care hospitals from PPS demonstrates its recognition that

PPS is an inadequate method for reimbursing such hospitals. But this simply begs the question discussed in the text: were plaintiffs' hospitals "long-term," within the meaning of the statute, from that first day?

these decisions to the Secretary." *Id.* The same is true here.

But, plaintiffs argue, if Congress had intended the exclusion to apply prospectively, it could have drafted the statute to provide a PPS exclusion for a hospital that "had" an average inpatient length of stay greater than 25 days "during its most recent cost reporting period." *Transitional Hosps.*, 40 F.Supp.2d at 11 (quoting Pls.' Mot. for Summ. J. at 15) (emphasis omitted). Frankly, we do not see such a revised statute as particularly less ambiguous. Indeed, we do not see why HHS could not have proffered the same editorial suggestion and then made the opposite argument: If Congress had intended hospitals to receive retroactive reimbursement as plaintiffs contend, wouldn't it have defined the exclusion as covering hospitals that "had" the requisite average during their "most recent cost reporting period"? In any event, while positing a "clearer" way to write a statute may suggest that an existing statute is ambiguous, it surely does not establish that it is unambiguous. And if the statute is not unambiguous, *Chevron* requires us to defer to a reasonable reading by the Secretary.

We also must take care to read the word "has" in the context of the entire phrase of which it is a part. Two elements of that context are important here. First, the statutory exclusion is for a hospital that has "an average" inpatient length of stay of greater than 25 days. The criterion of "an average" strongly militates against plaintiffs' view that a hospital's status must be measured at every moment in time. As HHS correctly points out, an average is a criterion that can only be assessed over a period of time. Moreover, the statute refers not to an average "over" a period of 25 days, but to an average "of" 25 days— necessarily indicating that the period of measurement must be more than 25 days in order reasonably to determine whether the "average" during that period was at least 25 days. Hence, the use of the word "has" in conjunction with the word "average" would not preclude waiting until six months have passed to determine whether, at that point, the hospital "has" an average of 25 days over a 180–day period.

Indeed, were we to read the statute as literally as plaintiffs and the district court suggest, plaintiffs' own contention—that they "met the 25–day requirement at all times during their operation" and so were entitled to payment from the first day— would be plainly incorrect. THC Br. at 4. On day one, the hospitals could not have had a 25–day average because 25 days had not yet passed. If a hospital must be, and may only be, paid for days on which it "has" a 25–day average, plaintiffs could not have qualified earlier than the 25th day. Even then, they could have done so only if every patient present on day one were still at the hospital 25 days later.

The second element of context that is important here is the statute's parenthetical phrase, "as determined by the Secretary." As we have discussed above, by employing this phrase Congress has made "an express delegation of authority to the agency to elucidate [the] specific provision of the statute by regulation." *Chevron,* 467 U.S. at 843–44, 104 S.Ct. 2778. This further takes the case out of the realm of *Chevron* step one's de novo review, and into the realm of *Chevron* step two—which asks only whether the agency's interpretation is reasonable. *See id.* And that gives the agency considerable leeway to determine how "has" is to be defined, and whether to require prospective, contemporaneous, or retrospective evaluation and payment. *See San Bernardino Mountains Community Hosp. Dist. v. Secretary of Health & Human Servs.*, 63 F.3d 882, 886–87 (9th Cir.1995) (holding that inclusion of phrase "as determined by the Secretary" in Medicare Act's definition of "sole community hospital" "make[s] clear that Congress intended to delegate to the Secretary the task of outlining and defining the criteria for attaining sole community hospital status").

Plaintiffs resist the conclusion that Congress has delegated definitional authority to HHS. They argue that the fact that the

parenthetical "as determined by the Secretary" follows the phrase "an average inpatient length of stay," means that Congress has only given the agency "discretion to determine how the average length of stay will be calculated"—and not whether the hospital "has" that average. THC Br. at 26. This is far too sophistic a reading. First, the concession that the agency has discretion to determine *how* to calculate the average necessarily means it has discretion to determine *whether* a hospital "has" that average—since a hospital cannot have a qualifying average unless it satisfies the agency's calculation methodology. Second, even if word placement were decisive, it is as true that the delegating parenthetical follows the phrase *"has* an average inpatient length of stay" as that it follows the phrase "an average inpatient length of stay." At most this renders the scope of Congress' delegation ambiguous, which again moves us to *Chevron*'s second step. *See Chevron,* 467 U.S. at 844, 104 S.Ct. 2778.[6]

### C

In reaching the conclusion that the statute unambiguously requires retroactive reimbursement for the hospitals' initial cost reporting period, the district court relied on another district court opinion, *County of Los Angeles v. Shalala,* 992 F.Supp. 26 (D.D.C.1998), which held that a provision of the Medicare statute required HHS to make retroactive adjustments to outlier payments.[7] *County of Los Angeles* held that the provision, which set a range for the "total amount of the additional payments *made,"* 42 U.S.C. § 1395ww(d)(5)(A)(iv) (emphasis added), unambiguously required the Secretary to adjust the additional payments retroactively to ensure that the total fell within the range. *See County of Los Angeles,* 992 F.Supp. at 36. It thus rejected the Secretary's interpretation of the provision as merely instructing her as to where to set outlier thresholds for the coming year. The district court in the instant case followed that line of reasoning, and held that HHS could not use prior-period experience merely to determine how to reimburse the plaintiff hospitals in the future, but rather had to reimburse the hospitals for their reasonable costs from the first date of their operation. *See Transitional Hosps.,* 40 F.Supp.2d at 12.

■ Although the district court's reliance on the opinion in *County of Los Angeles* cannot be faulted, this court reversed that decision seven months later. *See County of Los Angeles v. Shalala,* 192 F.3d 1005 (D.C.Cir.1999). Rejecting an argument based on verb tense, we held

---

6. Plaintiffs assert that Congress confirmed their reading of the long-term care exclusion in its 1997 amendments to the Medicare statute, which place payment limits on newly participating long-term care hospitals. Those amendments provide that:

> in the case of a hospital or unit that is within a class of hospital described in subparagraph (B) which first receives payments under this section on or after October 1, 1997—
> > (i) for each of the first 2 cost reporting periods for which the hospital has a settled cost report, the amount of the payment with respect to operating costs ... [shall be] equal to the lesser of ... [the amount of operating costs or a national limit.]

42 U.S.C. § 1395ww(b)(7)(A). Plaintiffs contend that this language indicates that Congress intended newly participating long-term

care hospitals to receive reimbursement for reasonable costs from the date of their first reporting period. But as the Secretary points out, this provision does not materially advance the analysis. By its terms, it applies only to a "subparagraph (B)" hospital. A subparagraph (B) hospital, in turn, is defined as including a hospital that comes within subsection (d)(1)(B)(iv)—the precise subsection that is in dispute in this case. *See id.* § 1395ww(b)(7)(B); *cf. Methodist Hosp.,* 38 F.3d at 1231 (noting, in the context of the Medicare statute, that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one") (internal quotation omitted).

7. As discussed in Part I above, outlier payments are a supplement to PPS reimbursement for hospitals with patients that stay for unusually long periods. *See* 42 C.F.R. §§ 412.80 *et seq.*

that "instead of embodying a retrospective inquiry into the amount of outlier payments that *have been* made," "the phrase 'payments made under this subparagraph' might just as plausibly reflect a prospective command to the Secretary about how to structure outlier thresholds for payments *to be* made in advance of each fiscal year." *Id.* at 1013. In so holding, we cited the Supreme Court's decision in *Regions Hospital v. Shalala,* 522 U.S. 448, 118 S.Ct. 909, 139 L.Ed.2d 895 (1998). There, the Court held that the statutory phrase, "recognized as reasonable," "by itself[ ] does not tell us whether Congress means to refer the Secretary to action already taken or to give directions on actions about to be taken." *Id.* 118 S.Ct. at 916 (quoting *Administrators of Tulane Educ. Fund v. Shalala,* 987 F.2d 790, 796 (D.C.Cir.1993)). "In other words," the Court said, "the phrase 'recognized as reasonable' might mean costs the Secretary (1) *has* recognized as reasonable for [prior reimbursement] purposes, or (2) *will* recognize as reasonable as a base for future . . . calculations." *Id.* By the same token, we conclude that the phrase at issue here—"has an average inpatient length of stay (as determined by the Secretary) of greater than 25 days"—is ambiguous and may refer to the hospital's status at the beginning of, during, or at the close of a cost reporting period. *Cf. United States Dep't of the Treasury v. FLRA,* 960 F.2d 1068, 1072 (D.C.Cir.1992) (holding that statutory phrase "adversely affected" is ambiguous and permits "alternative temporal readings").

### III

■ Having concluded that the analysis of *Chevron* step one does not resolve the case, we would ordinarily move to step two and ask whether the Secretary's interpretation of the meaning of the statute is reasonable. Plaintiffs argue that the Secretary's interpretation is not reasonable, contending that HHS has no justification for not permitting self-certification, for not utilizing the alternative of retroactive reimbursement, and for denying both options to long-term care hospitals while making them available to another category of PPS-excluded institutions: rehabilitation hospitals. *See* 42 C.F.R. § 412.23(b)(8), (b)(9).

HHS replies that it is perfectly reasonable to rely on actual data regarding length of stay rather than on a hospital's self-interested prediction. The Department explains that it permits self-certification by rehabilitation hospitals because the criteria for qualification of such hospitals are based on the "characteristics of the patients and the types of services that the facility furnishes," *Final Rule,* 57 Fed. Reg. at 39,801,[8] criteria which—unlike length of stay—a hospital can "virtually guarantee[ ]" from the first day of operations, HHS Reply Br. at 12. With respect to the alternative of retroactive adjustment, HHS points out that no one suggested such an option until after the district court litigation began in this case.[9] Moreover, HHS argues that retroactive adjustments are as likely to hurt hospitals that slip below the average during a period for which they have been prospectively qualified, as it is to help them by providing reimbursement for a prior period in which they became qualified along the way. By setting reimbursement rates "that are not later subject to retroactive correction," HHS contends, "the Secretary promotes certainty and predictability of payment for not only hospitals but the federal govern-

---

**8.** The statute excludes from PPS "a rehabilitation hospital (as defined by the Secretary)." 42 U.S.C. § 1395ww(d)(1)(B)(ii). The Secretary's implementing regulation defines such a hospital as one that, inter alia, serves an inpatient population of whom at least 75 percent require intensive rehabilitative services for the treatment of specified conditions including stroke, spinal cord or brain injury, major

multiple trauma, and amputation. *See* 42 C.F.R. § 412.23(b)(2).

**9.** Neither NALTH in its comments on the 1992 proposed rule, nor the THC plaintiffs themselves in their 1992 request to HCFA, proposed retroactive reimbursement. *See* HHS Reply Br. at 14 n.7.

ment." HHS Br. at 41 (quoting *County of Los Angeles*, 192 F.3d at 1019).

Although we ordinarily would now proceed to evaluate these various arguments under the standards of *Chevron's* second step, we cannot do so in this case. While the Secretary has discretion to establish a reasonable mechanism for determining whether a hospital has the requisite average length of inpatient stay, that discretion must be exercised through the eyes of one who realizes she possesses it. At several points, the Department's briefs suggest that the Secretary did realize that she had such discretion.[10] At other points, the briefs suggest quite the opposite.[11] Most relevant, however, is that the notice issued at the time the final rule was promulgated makes it quite clear the Secretary did not believe that she had the discretion to do what the plaintiffs request. *See, e.g., Final Rule*, 57 Fed.Reg. at 39,800–01 (*"We do not believe that the statute permits us* to extend the exclusion for long-term care hospitals to a hospital which has not demonstrated actual compliance with the statutory requirement.") (emphasis added); *id.* at 39,800 (declaring the Secretary's doubt that "the law would support such a policy"); *id.* at 39,801 ("[T]he [statutory] criterion for exclusion ... can be assessed only over a period of time. Thus, a hospital *cannot qualify* as a long-term care hospital until it has been in operation for some period of time.") (emphasis added).[12]

As the Supreme Court has instructed, an agency "order may not stand if the agency has misconceived the law." *SEC v. Chenery Corp.*, 318 U.S. 80, 94, 63 S.Ct. 454, 87 L.Ed. 626 (1943); *see Phillips Petroleum*, 792 F.2d at 1169–70. Applying

that principle, this court has held that "an agency regulation must be declared invalid, even though the agency might be able to adopt the regulation in the exercise of its discretion, if it was not based on the [agency's] own judgment but rather on the unjustified assumption that it was Congress' judgment that such [a regulation is] desirable" or required. *Prill v. NLRB*, 755 F.2d 941, 948 (D.C.Cir.1985) (internal quotations omitted) (alterations in original). Because the Secretary evaluated the various reimbursement alternatives on the assumption that "a hospital cannot qualify as a long-term care hospital until it has been in operation for some period of time," *Final Rule*, 57 Fed.Reg. at 39,801, and because that assumption is incorrect, the Secretary must make a fresh determination as to whether she wishes to adopt the self-certification or retroactive adjustment options.

**IV**

For the foregoing reasons, the judgment of the district court is reversed. The case is remanded to that court with instructions to remand it to HHS for further consideration consistent with this opinion.

10. *See, e.g.,* HHS Br. at 25, 28.

11. *See, e.g.,* HHS Br. at 12 (stating that in promulgating 1992 regulations, "HHS concluded that a self-certification procedure for long-term care hospitals would *violate its statutory mandate*"); *id.* at 15 (stating that in rejecting THC plaintiffs' request for self-certification, HCFA explained "that nothing in the statute or regulations would allow it to grant the hospitals an immediate exclusion from the PPS").

12. The Buto letter, although somewhat more equivocal, reflects a similar understanding. *See* Buto Ltr. at 2 (J.A. at 63) (denying plaintiffs' request because statute mandates exclusion only for "a hospital which *has* [emphasis added] an average length of stay (as determined by the Secretary) of greater than 25 days") (alteration and emphasis in original).