**State of ARIZONA, et al., Appellants,**

v.

**Tommy G. THOMPSON, Secretary of Health and Human Services and Dennis P. Williams, Acting Assistant Secretary for Management and Budget, U.S. Department of Health and Human Services, Appellees.**

No. 01–5013.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 7, 2001.

Decided March 5, 2002.

Charles A. Miller argued the cause and filed the briefs for appellants. Phyllis D. Thompson entered an appearance.

Anne Murphy, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief was Scott R. McIntosh, Attorney.

Before: EDWARDS, HENDERSON, and GARLAND, Circuit Judges.

GARLAND, Circuit Judge:

Six states seek review of a directive of the Department of Health and Human Services (HHS) that bars them from using Temporary Assistance for Needy Families (TANF) grants to pay for the common costs of administering the TANF, Medicaid, and Food Stamp programs. We conclude that HHS erroneously determined that it was without discretion to permit those expenditures.

## I

Prior to 1996, three important federal programs provided assistance to people in need: Aid to Families with Dependent Children (AFDC), 42 U.S.C. § 601 *et seq.* (1994); Medicaid, *id.* § 1396a *et seq.*; and the Food Stamp program, 7 U.S.C. § 2011 *et seq.* In 1996, Congress passed the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, referred to by the parties as the "Welfare Reform Act," Pub.L. No. 104–193, 110 Stat. 2105 (codified as amended in scattered sections of Title 42 and other titles of U.S.C.). The Welfare Reform Act replaced AFDC with the TANF program. Unlike AFDC, which was an individual entitlement program, TANF provides federal block grants that states may use for their own public assistance programs. *See* 42 U.S.C. § 601 *et seq.*; H.R. CONF. REP. No. 104–725, at 261 (1996); H.R. REP. No. 104–651, at 1322 (1996). The amount of a state's TANF grant is based on the amount of the reimbursement paid to the state under AFDC during an historical base period. *See* 42 U.S.C. § 603. In order to receive a TANF grant, a state must submit a state plan, which HHS must approve, describing how the state intends to use the grant. *Id.* § 602. A state may spend its grant "in any manner that is reasonably calculated to accomplish the purpose of" the TANF program, or "in any manner that the State was authorized to use amounts received" under AFDC. *Id.* § 604(a).

This case involves the use of TANF grants to pay the costs of program admin-

istration. Prior to the enactment of the Welfare Reform Act, the federal government reimbursed 50% of most state administrative expenditures for each of the three programs—AFDC, Medicaid, and Food Stamps—without a dollar limit on the amount of administrative expenditures eligible for federal reimbursement. *See* 42 U.S.C. § 603(a)(3) (1994) (AFDC); *id.* § 1396b(a)(7) (Medicaid); 7 U.S.C. § 2025(a) (Food Stamps). This partial reimbursement scheme continues for Medicaid and Food Stamps. As noted, however, TANF is a block grant program, under which a state receives a fixed amount of federal funds. A state may use those funds to administer the TANF program, but "shall not expend more than 15 percent of the grant for administrative purposes." 42 U.S.C. § 604(b)(1).

The specific point at issue here is whether states may use their TANF funds to pay for all of the costs that are common to the administration of TANF, Medicaid, and Food Stamps. Such costs may include, for example, the expense of determining the eligibility of applicants for assistance where the relevant criteria are common to all three programs, the cost of leasing offices and hiring employees who administer all of the programs, and the cost of administering databases containing the records of individuals who receive benefits under all of the programs.

For the past thirty years, the Office of Management and Budget (OMB) has issued government-wide standards concerning the allocation of the costs of government programs.[1] OMB Circular A–87 provides that, ordinarily, costs that benefit multiple programs funded by federal grants must be allocated among the benefiting programs "in accordance with relative benefits received," rather than allocated to a single program. Cost Principles for State, Local, and Indian Tribal Governments, OMB Circular A–87, Attach. A, ¶ C.3.a (1997).[2] The parties refer to this principle as "benefiting program allocation." Since 1988, HHS has incorporated by reference OMB Circular A–87 in its own regulations and guidance documents. *See* 45 C.F.R. § 92.22; *see also id.* § 74.27 (adopted in 1994); Implementation Guide for OMB Circular A–87, Cost Principles and Procedures for Developing Cost Allocation Plans and Indirect Cost Rates for Agreements with the Federal Government, ASMB C–10 (HHS April 1997).[3]

Notwithstanding the benefiting program allocation principle of OMB Circular A–87, during the life of the AFDC program HHS permitted states to allocate entirely to AFDC all costs that were common to administration of the AFDC, Medicaid, and Food Stamp programs. The parties refer to this approach, in which common costs are allocated to a single program, as "pri-

---

1. *See, e.g.,* Exec. Order No. 11,541 § 1(a), (b), 35 Fed.Reg. 10,737 (July 2, 1970).

2. The current version of Circular A–87 is a 1997 amendment of the 1995 version. *See* Government Wide Grants Management Requirements, 62 Fed.Reg. 45,934 (OMB Aug. 27, 1997) (amending Cost Principles for State, Local, and Indian Tribal Governments, 60 Fed.Reg. 26,484 (OMB May 17, 1995)). The 1995 version was, in turn, a revision of a document published in 1981. *See* Cost Principles for State and Local Governments, 46 Fed.Reg. 9548 (OMB Jan. 28, 1981) (reissuing

Federal Management Circular 74–4 as OMB Circular A–87). The provision cited in the text above has remained substantively the same throughout these amendments and revisions.

3. Although HHS issued a revised version of its Implementation Guide in 1997, after the enactment of TANF, it did so in response not to TANF but rather to OMB's 1995 revision of Circular A–87. The Guide does not take account of the TANF legislation. *See* Appellees' Br. at 12 n.12.

mary program allocation." Its application to the AFDC program was regarded as an exception to the general rule of Circular A-87.[4]

Following passage of the Welfare Reform Act and creation of the TANF program, HHS moved to stop states from continuing to employ primary program allocation. On September 30, 1998, without notice or opportunity for comment, HHS' Office of Grants and Acquisition Management (OGAM) issued OGAM Action Transmittal 98-2. The Action Transmittal reconfirms that, as a general rule, Circular A-87 requires that:

> [I]f any program benefits from an activity or cost, then costs must be allocated to each program. Where multiple programs are involved, a single program may not be designated as the sole benefiting program (primary program).

OGAM Action Transmittal 98-2 (HHS Sept. 30, 1998). Although the Action Transmittal recognizes that there are exceptions to this general rule, it further declares that:

> Cost shifting [to a primary program] is not permitted by most program statutes, except where there is a specific legislative provision allowing such cost shifting. *While the former AFDC program allowed such an exception, the TANF legislation that replaced AFDC does not permit it being designated as the sole benefiting or primary program.* Therefore, the TANF program is subject to the cost allocation principles of A-87.

*Id.* (emphasis added). Starting with state fiscal years beginning on or after October 1, 1998, the Action Transmittal requires state cost allocation plans for the TANF program to comply with the benefiting program allocation principle. *Id.*

Six states[5] filed suit in the United States District Court for the District of Columbia seeking to prevent HHS from enforcing Action Transmittal 98-2. The States alleged that they incur common administrative costs that benefit TANF, Medicaid, and Food Stamps, and that the Welfare Reform Act permits them to "use their TANF grants to cover costs that benefit TANF and other programs simultaneously." Compl. at 18–19. In their papers in the district court, the plaintiffs explained that "because of the fall in welfare caseloads, states have been unable to use their full TANF grants, so that they are better off financially by charging all common costs to the TANF program." Plaintiffs' Mot. for Summ. J. at 20 n.5.

The States' complaint charged that Action Transmittal 98-2 violated the Administrative Procedure Act (APA) because, inter alia, it was not in accordance with law (i.e., with the TANF provisions of the Welfare Reform Act), and because it was issued without notice and comment. *See* 5 U.S.C. §§ 553, 706(2)(A), (D). The district court rejected these contentions and granted summary judgment in favor of HHS. *Arizona v. Shalala*, 121 F.Supp.2d 40 (D.D.C.2000). The court concluded that HHS' interpretation of the Welfare Reform Act deserved judicial deference under *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), that the Department reasonably interpreted the legislation to bar states from applying the primary program allocation approach to their TANF grants, that notice and comment procedures were not required in this case,

---

**4.** *See* OGAM Action Transmittal 98-2 (HHS Sept. 30, 1998); Appellants' Br. at 5–6; Appellees' Br. at 13–14.

**5.** These include original plaintiffs Arizona, Maryland, Michigan, New York, and Tennessee, as well as intervenor Florida (hereinafter "the States").

and that the plaintiffs' other arguments were without merit.[6]

## II

We review the district court's grant of summary judgment against the States' APA claims de novo. *See Independent Petroleum Ass'n of Am. v. DeWitt*, 279 F.3d 1036, 2002 WL 191748, at *2 (D.C.Cir. Feb. 8, 2002); *Dr. Pepper/Seven–Up Cos. v. FTC*, 991 F.2d 859, 862 (D.C.Cir.1993). We begin—and, in Part III, end—with the States' first argument: that the Action Transmittal is "not in accordance with law," 5 U.S.C. § 706(2)(A), because its interpretation of the TANF provisions of the Welfare Reform Act is inconsistent with the statute. HHS contends that its interpretation of the legislation must be accorded substantial deference under the rule announced in *Chevron*. The States contend, and we agree albeit for a different reason, that *Chevron* deference is inappropriate in this case.

■ *Chevron* instructs reviewing courts to apply a two-step framework to issues of statutory construction. First, we must ask "whether Congress has directly spoken to the precise question at issue," in which case we "must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43, 104 S.Ct. at 2781. If the "statute is silent or ambiguous with respect to the specific issue," we move to the second step and must defer to the agency's interpretation as long as it is "based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782.

The States contend that the Supreme Court's recent decision in *United States v. Mead Corp.*, 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001), which was issued after the district court's decision in this case, makes *Chevron* deference inapplicable to agency action of the kind embodied in the Action Transmittal. They point out that in *Mead*, the Court said: " '[I]nterpretations contained in policy statements, agency manuals, and enforcement guidelines' ... are beyond the *Chevron* pale." *Id.* at 2175 (quoting *Christensen v. Harris County*, 529 U.S. 576, 587, 120 S.Ct. 1655, 1657, 146 L.Ed.2d 621 (2000)). Action Transmittal 98–2 is a policy statement, the States contend, and thus does not deserve judicial deference.[7]

■ We need not decide whether HHS' decision to announce its statutory interpretation in the form of an Action Transmittal deprives that interpretation of judicial deference, because the Department's pronouncement does not warrant deference for another reason. The Court's direction in *Chevron* was to accord deference to an agency's reasonable policy choice where Congress delegated to the agency the discretion to make such a choice. *See Chevron*, 467 U.S. at 843–44, 845, 865–66, 104 S.Ct. at 2782–83, 2783, 2792–93. The problem here, however, is that in barring primary program allocation, HHS did not purport to exercise discretion. To the contrary, the Action Transmittal declares that "the TANF legislation ... *does not permit* it being designated as the ... primary program." Action Transmittal 98–2 (emphasis added). Confirming the point, HHS' briefs state the Department's view

---

**6.** The district court also concluded that Action Transmittal 98–2 constituted final agency action, a prerequisite for review under the APA. *See* 5 U.S.C. § 704. HHS does not dispute that conclusion on appeal, and we agree with the district court's analysis. *See Bennett v.*

*Spear*, 520 U.S. 154, 177–78, 117 S.Ct. 1154, 1168–69, 137 L.Ed.2d 281 (1997).

**7.** *See generally* OGAM Action Transmittal 98–1 (HHS Sept. 30, 1998) ("Action Transmittals ... transmit interpretive rules or general statements of policy.").

that it has no choice but to require benefiting program allocation. *See* Appellees' Br. at 42 (contending that "*it is the intent of Congress, rather than of HHS, that obliges the States to cover costs allocated outside TANF from programs other than TANF*" (emphasis added)); *see also id.* at 27. In *Chevron* terms, then, the agency itself has stopped at step one: HHS believes that the statute clearly bars primary program allocation, and that it is without discretion to reach another result.

█ Deference to an agency's statutory interpretation "is only appropriate when the agency has exercised its *own* judgment," not when it believes that interpretation is compelled by Congress. *Phillips Petroleum Co. v. FERC*, 792 F.2d 1165, 1169 (D.C.Cir.1986); *see Transitional Hosps. Corp. v. Shalala*, 222 F.3d 1019, 1029 (D.C.Cir.2000); *Prill v. NLRB*, 755 F.2d 941, 942, 948, 956 (D.C.Cir.1985). The question of whether benefiting program allocation is actually compelled by statute is a question of law, which we review de novo. *See Chevron*, 467 U.S. at 843 n. 9, 104 S.Ct. at 2782 n. 9; *Transitional Hosps.*, 222 F.3d at 1026. It is to that question that we now turn.[8]

### III

█ The States cite several provisions of the Welfare Reform Act in support of their challenge to HHS' belief that the TANF legislation bars the use of primary program allocation. We need not consider all of the States' arguments, as two key provisions, subsections (1) and (2) of 42 U.S.C. § 604(a), are sufficient to decide the case.[9] Section 604(a) provides:

[A] State to which a grant is made under [TANF] may use the grant—

(1) in any manner that is reasonably calculated to accomplish the purpose of this part . . . ; or

(2) in any manner that the State was authorized to use amounts received under part A [the AFDC and Emergency Assistance programs] or F [the Job Opportunities and Basic Skills program] of this subchapter, as these parts were in effect on September 30, 1995. . . .

42 U.S.C. § 604(a). We consider these two subsections below.

### A

Citing § 604(a)(1), the States contend that they may pay common administrative costs out of their TANF grants because such expenditures are "reasonably calculated to accomplish the purpose of" the TANF program. That purpose, as de-

---

**8.** In 1999, after notice and comment, HHS issued TANF regulations that, the agency contends, incorporate the benefiting program allocation principle by requiring conformity with OMB Circular A–87. *See* Temporary Assistance for Needy Families Program, 64 Fed.Reg. 17,720, 17,842, 17,895 (Apr. 12, 1999) (codified at 45 C.F.R. § 263.11(b)). Although the present lawsuit challenges only the 1998 Action Transmittal and not the 1999 regulations, HHS contends that the use of notice and comment in promulgating the 1999 regulations moots the *Mead* issue and qualifies the Department's determination for *Chevron* treatment. However, in concluding that deference is inappropriate here, we have relied not on the form in which HHS announced its cost allocation principle, but rather on the Department's conclusion that it was without discretion to adopt any other position. The 1999 Federal Register notice does not reflect any new understanding that the Department has discretion in the matter.

**9.** Moreover, because we conclude that these provisions establish that Action Transmittal 98–2 is "not in accordance with law," 5 U.S.C. § 706(2)(A), we need not consider the States' alternative argument that it was issued "without observance of procedure required by law," *id.* § 706(2)(D), namely the notice-and-comment procedure of 5 U.S.C. § 553.

scribed in 42 U.S.C. § 601(a), is "to increase the flexibility of the states in operating a program" designed to assist needy families and end dependence on government benefits.[10]

HHS does not dispute that states may pay the costs of administering the TANF program itself out of their TANF grants. Indeed, a contrary position would be hard to square with § 604(b)(2), which, in limiting expenditures for administrative purposes to "15 percent of the grant," clearly assumes that some such expenditures will be made. HHS contends, however, that allocating costs of administering Medicaid and Food Stamps to TANF is not "reasonably calculated" to accomplish the purpose of the TANF legislation. TANF, the Department argues, does not benefit from the payment of costs that are the responsibility of other programs.

But the costs at issue here are not costs that are solely applicable to other programs. This case is about common costs, such as the expense of determining eligibility for programs that have the same eligibility criteria. These are costs that TANF would have to bear even if the other programs did not exist, and that are incurred in order to ensure that a state's TANF program accomplishes its objec-

tives. Accordingly, there is no question but that the TANF program "benefits" from payment of these common costs; indeed, the premise of "benefiting program allocation" is that the costs subject to allocation "benefit" all of the programs at issue. *See* Action Transmittal 98–2 (requiring that "costs be allocated to all *benefiting* programs based on relative benefits derived" (emphasis added)).[11]

HHS further argues that the statutory 15% limitation on administrative expenditures demonstrates congressional concern about excessive administrative spending, and supports the view that expenditure of TANF funds on administrative costs allocable to Medicaid and Food Stamps is unauthorized. Only the first half of this argument is correct. There is no doubt that Congress imposed a 15% cap in order to limit administrative expenditures: what other purpose could such a limit have? But nothing in the primary program allocation approach preferred by the plaintiffs would permit a state to spend more than that the 15% limit on administrative funds. Moreover, while the existence of a cap reflects a concern about limiting expenditures, it may also indicate Congress' view that the cap alone is sufficient to satisfy that concern, and that there is no need to

**10.** Section 601(a) states:
> The purpose of this part is to increase the flexibility of States in operating a program designed to—
> > (1) provide assistance to needy families so that children may be cared for in their own homes ...;
> > (2) end the dependence of needy parents on government benefits by promoting job preparation, work, and marriage;
> > (3) prevent and reduce the incidence of out-of-wedlock pregnancies ...; and
> > (4) encourage the formation and maintenance of two-parent families.

42 U.S.C. § 601(a).

**11.** For the same reason, we reject HHS' contention that the congressional intent behind

the provisions for 50% federal participation in the costs of administering the Medicaid and Food Stamp programs, 42 U.S.C. § 1396b(a)(7); 7 U.S.C. § 2025(a), would be violated if states were allowed "to shift Medicaid and Food Stamp costs into TANF so that the full amount of those administrative costs will be paid in federal dollars." Appellees' Br. at 45. As noted in the text, primary program allocation does not permit the shift of "Medicaid and Food Stamp costs," but rather of costs that those programs share in common with TANF. Neither of the cited provisions addresses the question of common costs or purports to disallow expenditures separately authorized by § 604(a)(1).

tell the states how to spend their grant money within that cap as long as the expenditures are otherwise calculated to advance the purpose of the program.

Finally, HHS contends that OMB Circular A–87 represented "a well-established background of cost principles for federal grants" against which Congress enacted the TANF program. Appellees' Br. at 43. Circular A–87 was in effect when Congress enacted the Welfare Reform Act, HHS argues, and "if Congress had wished TANF to be exempt from these principles, it could have expressly so provided." *Id.* Because it did not do so, the Department continues, "it is reasonable to suppose that Congress understood that TANF costs would be allocated within the parameters of Circular A–87." *Id.* The problem with this argument is that the "background" against which Congress enacted the Welfare Reform Act included *both* Circular A–87's general principle of benefiting program allocation *and* its well-recognized exception for the AFDC program. *See supra* Part I. Although that background may not compel the conclusion that Congress intended to continue the AFDC exception for its successor program, TANF, it hardly proves the opposite.

The benefiting program allocation principle may well be an appropriate tool for accounting for common costs, but it is only that—an accounting tool, not a statutory command. It is not possible to read § 604(a)(1)—which permits a state to use its TANF grant "in *any* manner that is reasonably calculated to accomplish the purpose" of the TANF legislation—as barring HHS from permitting a state to spend its grant money on the costs of running the TANF program merely because those expenditures help run other programs as well. That conclusion is further reinforced by Congress' declaration that the "purpose" referenced in § 604(a)(1) is "to in-

crease the flexibility of States in operating [the] program." *Id.* § 601(a); *see also* H.R. REP. No. 104–81, pt. 1, at 15 (1995) (noting "that a major purpose of the [TANF legislation] is to allow States maximum flexibility in the use of Federal dollars"). Although we do not foreclose the possibility that HHS could, in the exercise of its discretion, determine that the allocation of common costs to TANF is not reasonably calculated to accomplish TANF's purpose, the statute does not require HHS to reach that conclusion.

### B

■ The States also contend that authorization for primary program allocation may independently be found in the "grandfather clause" of § 604(a)(2). That subsection permits a state to use a TANF grant "in any manner that the state was authorized to use amounts received" under the AFDC program. 42 U.S.C. § 604(a)(2). Since states were authorized to use amounts received under AFDC to pay the common administrative costs of AFDC, Medicaid, and Food Stamps, the States argue that subsection (a)(2)—like subsection (a)(1)—authorizes HHS to permit primary program allocation. HHS disputes this view of § 604(a)(2) for two reasons.

First, the Department contends that the key phrase, "authorized to use," refers solely to expenses that were authorized under "state plans," which described the substantive assistance programs the state intended to run. *See* 45 C.F.R. §§ 201.2, 201.3 (1995). Administrative costs, by contrast, were addressed in the states' "cost allocation plans," which set forth the states' accounting methods. *See id.* § 95.505 (1995). Since the use of AFDC funds for common administrative costs was authorized not under "state plans," but rather under state "cost allocation plans," HHS contends that the use of TANF

funds for such a purpose is not encompassed by the grandfather clause of § 604(a)(2).

We disagree. There is nothing in the phrase "authorized to use" that dictates that it be read as "authorized to use *under a state plan*," rather than "authorized to use *under a state cost allocation plan*." Once again, although we do not foreclose the possibility that HHS could, in the exercise of its discretion, interpret the phrase in that way, it is certainly not required to do so.

Nor does HHS' reference to the legislative history of § 604 advance its claim that "authorized to use" refers only to substantive programs. The Department refers us to a sentence in the Conference Report on the Welfare Reform Act, which states that "*activities* now authorized under" AFDC are also authorized under TANF. H.R. Conf. Rep. No. 104–430, at 320 (1995) (emphasis added). HHS contends that the word "activities" means substantive programs rather than administrative functions, but again we are not persuaded that the word can bear only the former meaning. Many administrative functions can readily be characterized as "activities," including the hiring of staff, the determination of eligibility, and the maintenance of databases. We see no indication that the Conference Report used a general word like "activities" to signal an intent to exclude common administrative costs from the compass of § 604(a)(2).

HHS also offers a second argument for rejecting the States' claim that primary program allocation is authorized by § 604(a)(2): the only reason such allocation was permitted under AFDC, HHS contends, was that the AFDC statute specifically allowed it. Since TANF contains no such specific authorization, the Department continues, grandfathering plainly was not intended. *See* Action Transmittal 98–2.

The problem with this argument is its premise: in fact, the AFDC statute did not specifically authorize primary program allocation. When pressed to identify the statutory provision allegedly at issue, HHS' counsel conceded that there was no language in the AFDC statute that addressed the allocation issue, one way or the other. Instead, HHS relies on the fact that the eligibility criteria for the three programs were identical under the prior statutory regime, while TANF permits but does not require the states to use common eligibility criteria.[12] HHS also relies on the fact that, under the prior regime, it made no difference from the standpoint of the federal fisc whether administrative costs were allocated to AFDC or shared among all three programs, because the federal government paid 50% of those costs for each program.[13] That is no longer true for TANF, since a state may pay all of its administrative costs out of its federal grant, subject only to the 15% cap. *See* 42 U.S.C. § 604(b)(1).

■ Once again, these are arguments of policymaking discretion rather than law.

---

12. Prior to the Welfare Reform Act, the statutes setting forth eligibility criteria for Medicaid and Food Stamps each referenced part A of Title IV of the Social Security Act, 42 U.S.C. § 601 *et seq.* (1994), the former AFDC statute. *See id.* § 1396a(a)(10)(A)(i)(I) (Medicaid); 7 U.S.C. § 2014(a) (Food Stamps). The Welfare Reform Act largely permits the states to determine the eligibility criteria for TANF, *see* 42 U.S.C. § 602(a)(1)(B)(iii), but leaves the criteria for Medicaid and Food Stamps unchanged, *see id.* § 1396u–1(a).

13. *See* 42 U.S.C. § 603(a)(3) (1994) (AFDC); 7 U.S.C. § 2025(a) (Food Stamps); 42 U.S.C. § 1396b(a)(7) (Medicaid).

Although the differences between AFDC and TANF may justify a decision by HHS to depart from the method of cost allocation it accepted under the former program, they do not compel it to do so. Nor do they establish that it would be unreasonable for the Department to approve the allocation method preferred by the States. Although states are not required to use the same eligibility rules for TANF as for Medicaid and Food Stamps, they are permitted to do so. *See id.* § 602(a)(1)(B)(iii) (leaving criteria for TANF eligibility up to the states). And, according to the plaintiffs, in most states many eligibility determinations remain common to all three programs. *See* Appellants' Reply Br. at 4. If it was the existence of common eligibility rules and hence common costs that justified primary program allocation before, it is not readily apparent why that justification disappears merely because the common rules are now the result of voluntary state decisions rather than federal mandates.[14] Similarly, although primary program allocation may not have cost the federal government additional money under the prior regime, nothing in the TANF

legislation compels the conclusion that saving federal (as compared to state) money must be the guide for cost allocation, particularly since Congress provided its own solution to the problem of excessive administrative costs in the form of the 15% cap.[15]

## C

 Finally, we address a contention pressed by HHS at oral argument: that whatever the import of § 604(a), OMB Circular A–87 independently deprives the Department of discretion to permit the use of primary program allocation. According to HHS, this is because the Circular requires all federal agencies to use benefiting program allocation in the administration of federal grants. Putting to one side questions raised by the plaintiffs concerning the legal force of Circular A–87, we reject this contention because the Department did not regard the Circular as having an effect *independent of the TANF legislation* when it issued Action Transmittal 98–2. *See Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 212, 109 S.Ct. 468, 473–74, 102 L.Ed.2d 493 (1988) (" 'The courts may

---

**14.** Moreover, some of the common administrative costs subject to primary program allocation under AFDC did not relate to eligibility determination at all, but rather to such things as the renting of space for welfare offices. It is not apparent why a change in eligibility requirements would be relevant to the question of whether such non-eligibility costs were grandfathered by § 604(a)(2).

**15.** The district court found additional, although "hardly dispositive," support for HHS' interpretation of § 604(a)(2) in § 502 of the Agricultural Research Extension and Education Reform Act of 1998, codified at 7 U.S.C. § 2025(k). *See Arizona,* 121 F.Supp.2d at 54–55. Section 502 directs the Secretary of Agriculture to calculate the amount included in a state's TANF grant for what the state would have historically received under AFDC for the common costs of determining AFDC and Food Stamp eligibili-

ty; the Secretary is then directed to reduce, by that amount, the federal payment to the state for the administrative costs of the Food Stamp program. 7 U.S.C. § 2025(k)(2)(B), (3)(A). We do not view § 502 as supporting HHS' conclusion that Congress barred states from using their TANF grants to pay for all common administrative costs. Rather, § 502 reflects Congress' understanding that historical "common costs for administering public assistance programs … were included in the calculation of each State's new TANF grant," and Congress' determination that Food Stamp reimbursements should therefore be reduced to prevent states from "receiv[ing] a *second* reimbursement for common costs in the Food Stamp (and Medicaid) programs, while retaining their full TANF block grant." H.R. Conf. Rep. No. 105–492, at 115–16 (1998) (emphasis added).

not accept appellate counsel's *post hoc* rationalizations for agency [orders].'" (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962))).

Although Circular A–87 provides that common costs must ordinarily be allocated among benefiting programs, Action Transmittal 98–2 recognizes that there are exceptions to that rule. In particular, it acknowledges that an exception was made for the former AFDC program because, the Transmittal states, there was "a specific legislative provision allowing such cost shifting." Although in fact there was no such specific provision in the AFDC statute, *see supra* Part III.B, the statement in the Action Transmittal reflects HHS' underlying view that Circular A–87 does not independently constrain the Department if a statute allows an alternative allocation method. That view is also reflected in HHS' Implementation Guide for OMB Circular A–87, ASMB C–10, which states that, while Circular A–87 requires the use of benefiting program allocation, primary program allocation may be used "where the head of an awarding agency determines that the agency's enabling legislation permits" it. *Id.* ¶ 2.11 at 2–13. In accord with this analysis, the Action Transmittal's rationale for applying the general rule of Circular A–87 to TANF is simply that TANF does not permit an exception: "[T]he TANF legislation ... does not permit it being designated as the sole benefiting or primary program. *Therefore,* the TANF program is subject to the cost allocation principles of A–87." Action Transmittal 98–2 (emphasis added).

In short, HHS' determination that Circular A–87 applies to TANF was not made without reference to the Department's construction of the TANF legislation. To the contrary, that determination was made in reliance on HHS' mistaken belief that the statute gave it no choice in the matter. Although nothing we have said necessarily precludes HHS, in the exercise of its discretion, from relying on the principles of Circular A–87 to determine the most appropriate cost allocation rule to apply to TANF, that is not the course the Department followed in this case.

## IV

■ HHS' Action Transmittal 98–2 does not represent a determination by the Department that it is reasonable to interpret the Welfare Reform Act as barring states from allocating their common administrative costs to TANF. Rather, it reflects HHS' incorrect assumption that such an interpretation is the only one that is permissible. As we have said before, "an agency regulation must be declared invalid, even though the agency might be able to adopt the regulation in the exercise of its discretion, if it 'was not based on the [agency's] own judgment but rather on the unjustified assumption that it was Congress' judgment that such [a regulation is] desirable'" or required. *Prill,* 755 F.2d at 948 (quoting *FCC v. RCA Communications,* 346 U.S. 86, 96, 73 S.Ct. 998, 1005, 97 L.Ed. 1470 (1953)) (alterations in original).[16] Accordingly, the decision of the district court is reversed, and the case is remanded to that court with instructions to remand to HHS for further consideration

---

16. *See Transitional Hosps.,* 222 F.3d at 1029 (remanding where HHS erroneously interpreted the Medicare statute as barring the treatment of certain hospitals as "long-

term" care facilities); *Prill,* 755 F.2d at 942 (remanding where the NLRB adopted a definition of "concerted activities" that it erro-

consistent with this opinion.[17]

*Reversed and remanded.*

neously regarded as "mandated" by the National Labor Relations Act).

17. Because HHS did not adopt the interpretation contained in the Action Transmittal as an exercise of its discretion, we have no occasion to decide whether, if it did so, the same interpretation would be sustained if promulgated in a form warranting *Chevron* deference. *See Transitional Hosps.*, 222 F.3d at 1028.