State of NEBRASKA, DEP'T OF
HEALTH & HUMAN SVS.,
Plaintiff,

v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES
et al, Defendants.

No. CIV.A. 03–1873(EGS).

United States District Court,
District of Columbia.

Sept. 30, 2004.

Phyllis D. Thompson, Washington, DC, for Plaintiff.

Claire M. Whitaker, Washington, DC, for Defendants.

### MEMORANDUM OPINION

SULLIVAN, District Judge.

## I. Introduction

Plaintiff, the State of Nebraska Department of Health and Human Services ("Nebraska"), challenges the determination made by the Department of Health and Human Services Departmental Appeals Board ("DAB"). The determination, known as Decision 1882, disapproved Nebraska's amendment to its cost allocation plan. The amendment proposed by Nebraska allocates the costs of training Nebraska's protection and safety workers ("PSWs") exclusively to the Federal Foster Care and Adoption Assistance Program under Title IV–E of the Social Security Act. Plaintiff claims that this training is specifically developed and designed to meet the requirements of Title IV–E and that this training is only provided to trainees who handle or will handle Title IV–E cases. Pl. Resp. at 2 (citing A.R. 493–94). Nebraska seeks review of the DAB Decision under the Administrative Procedures Act ("APA"). 5 U.S.C. § 701 *et seq.*

Defendants are the U.S. Department of Health and Human Services ("HHS") and Tommy Thompson, in his capacity as Secretary of HHS. They argue that the DAB's decision upholding HHS's Division of Cost Allocation's ("DCA") disapproval of Nebraska's CAP was appropriate. Specifically, the DAB found that

> [I]n enacting title IV–E, Congress made no commitment that the federal government would assume responsibility for

overall funding of child welfare programs which have traditionally been funded by the states. Instead, Congress provided for funding of administrative expenditures, including training expenditures, only to the extent that the Secretary of the Department of Health and Human Services (HHS) finds them necessary for the provision of child placement services and the proper and efficient administrative of the state plan. DAB Decision at 1 (A.R.1). Defendants request that the decision be affirmed and this case be dismissed with prejudice.

## II. Background

### A. Federal Cost Principles

States that receive funds under the Social Security Act. and other federal assistance programs incur some administrative costs to meet the requirements of the programs they administer. Pursuant to 45 C.F.R. § 95.501 *et seq.*, each state is required to submit to the HHS Division of Cost Allocation a cost allocation plan ("CAP")[1] that details how funds will be spent. A state may claim federal financial participation ("FFP") "for costs associated with a program only in accordance with its approved cost allocation plan." 45 C.F.R. § 95.517.

In reviewing a CAP or CAP Amendment, DCA consults with the HHS division affected by the allocation, which in this case is the Administration for Children and Families ("ACF"). In determining whether Nebraska's CAP was appropriate, DCA applied the Office of Management and Budget ("OMB") Circular A–87, made applicable to the Title IV–E program by 45 C.F.R. §§ 74.27(a), 92.4(a)(3), and 92.22(b). DAB Decision at 3 (A.R.3). OMB Circular A–87 states that in order to be allowable, a cost must "be necessary and reasonable for proper and efficient performance and administration of Federal awards" and "[b]e allocable to Federal awards. . . ." Pl.'s Mot. Attach. A at ¶ C.1. It further instructs, "[a] cost is allocable to a particular cost objective if the goods or services involved are chargeable or assignable to such cost objectives in accordance with relative benefits received." Pl.'s Mot. Attach. A at ¶¶ C.3.a, D, and E. OMB Circular A–87 provides that common costs should ordinarily be allocated among benefitting programs, but OMB Circular A–87 does not require it. *Arizona v. Thompson*, 281 F.3d 248, 259 (D.C.Cir.2002).

Defendants note that ACF has provided guidance to states concerning allocation of Title IV–E administrative expenses in three ACF transmittals: ACYF–PA–87–05[2], ACYF–PA–90–01[3], and ACF–IM–91–

1. A CAP is defined as "a narrative description of the procedures that the State agency will use in identifying measuring and allocating all States agency costs incurred in support of all programs administered by the State agency." 45 C.F.R. § 95.505.

2. ACYF–PA–87–05 states in relevant part that:

Allowable administrative costs for activities such as recruitment and licensing of foster homes, training and activities described in the previous section that are not linked directly to the eligibility of children must be allocated to title IV–E, State foster care, and other State/Federal programs in such a manner as to assure that each participating

program is charged its proportionate share of the costs. The allocation may be determined by case count of title IV–E–eligible children in relation to all children in foster care under the responsibility of the State title I–E/IV–B agency or on some other equitable basis.
A.R. 779.

3. ACYF–PA–90–01 states in relevant part that:

All training costs must be allocated to title IV–E, State foster care and other State/Federal programs in such a manner as to assure that each participating program is charged its proportionate share of the costs. The allocations may be determined by a

15 [4] (hereinafter "ACF transmittals").

## B. Title IV–E

Through the Adoption Assistance and Child Welfare Act of 1980, Public Law No. 96–272, 94 Stat. 500, Congress amended the Social Security Act to establish a foster care and adoption assistance program, described in Title IV–E. 42 U.S.C. § 670 *et seq.* Title IV–E replaced the foster care program that had been funded under Title IV–A of the Aid to Families with Dependant Children ("AFDC") program. Title IV–E authorizes appropriations to enable states "to provide, in appropriate cases, foster care . . . for children who otherwise would be eligible for assistance" under a state's former AFDC program and to provide for "adoption assistance for children with special needs." 42 U.S.C. § 670.

Concurrently with the enactment of Title IV–E, Congress enacted a revised Title IV–B (Child Welfare Services Program), which provides funding for a broad range of social services to families and may also be used for the same type of funds under Title IV–E. 45 C.F.R. §§ 1355.33(b)(1) and 1355.36(b)(4). Title IV–B has a funding cap; Title IV–E does not. 42 U.S.C. § 621. DAB Decision at 2 (A.R.2).

In addition to foster care maintenance payments and adoption assistance payments, Title IV–E provides for funding for expenditures "found necessary by the Secretary for the provision of child placement services and for the proper and efficient administration of the State plan." 42 U.S.C. § 674(a)(3). Section 674(a) provides for federal financial participation ("FFP") for most types of such administrative costs at the rate of 50%. 42 U.S.C. § 674(a)(3)(C). However, it provides for FFP at the rate of 75% for such expenditures that a state incurs to train personnel employed by or preparing for employment by the state or local agency administering the state's Title IV–E program. 42 U.S.C. § 674(a)(3)(A). DAB Decision at 3–4 (A.R.3–4).

A state's Title IV–B plan must include a training plan that covers training activities and costs funded under Title IV–E. 45 C.F.R. § 1357.15(t)(1). The HHS regulation implementing Title IV–E reiterates this training cost provision. 45 C.F.R. 1356.60(b)(2). It further directs that "the State's cost allocation plan shall identify which costs are allocated and claimed under this program." 45 C.F.R.

---

case count of title IV–E eligible children in relation to all children in foster care under the responsibility of the State title IV–E/IV–B agency or on some other equitable basis. A.R. 782.

4. ACF–IM–91–15 states in relevant part that:

It has come to our attention that there may be some confusion as to whether training costs . . . should be allocated among all benefitting programs or whether such costs can be direct-charged to title IV–E. The purpose of this Information Memorandum is to restate the Federal requirement on this issue. . . . Policy Announcement ACYF–PA–90–01 states that all training costs must be allocated to title IV–E, State foster care and other State/Federal programs in such a manner as to assure that each participating

program is charged its proportionate share of the costs. This is in accordance with 45 C.F.R. Part 95.507(a)(2), which requires that State cost allocation plans conform to the accounting principles and standards prescribed in Office of Management and Budget (OMB) Circular A–87. OMB Circular A–87 defines indirect costs as those incurred for a common or joint purpose which benefit more than one cost objective. It further requires that indirect cost pools be distributed to the benefitting cost objectives in such a manner which will produce an equitable result. INFORMATION: Training costs for all training . . . must be allocated among all benefitting programs and may not be direct-charged to title IV–E, unless title IV–E is the only benefitting program. A.R. 788–90.

§ 1356.60(c). Moreover, it explicitly states that the statewide automated child welfare information system expenditures "shall be treated as necessary for the proper and efficient administration of the State plan without regard to whether the system may be used with respect to foster or adoptive children other than those on behalf of whom foster care maintenance or adoption assistance payments may be made under this part." 45 C.F.R. § 1356.60(e).

However, Title IV–E regulations do not address how training costs should be allocated. Plaintiff maintains that ACF policy statements from the early years of Title IV–E advise that if at least 85% of training is directed toward Title IV–E foster care, all training for eligible trainees and for trainers may be charged to Title IV–E, and that training developed for and directly benefiting Title IV–E may be allocated entirely to Title IV–E even if the employees attending the training are not fully supported by the Title IV–E program. A.R. 254 [5] and A.R. 256–58. [6]

**5.** The Letter from Nicholas Cordasco, Director of the Office of Fiscal Operations at the Department of Health and Human Services, to Robert Donahue, Director of the Office of Human Resources Development at the New York State Department of Social Services, on June 14, 1984, states in relevant part:

After consultation with our Central Office, we agree that where the training is of staff whose time is primarily spent on title IV–E activities, the total training might be charged to Title IV–E if the training is related to foster care and adoption services. Training developed for and which directly benefits a program may be allocated entirely to the befitting title, even if the employees attending the training are not fully supported by the program involved.
A.R. 254.

**6.** Memorandum from Dodie Livingston, Commissioner of the Administration for Children, Youth and Families at the Department of Health and Human Services to William Acosta, Regional Administrator, OHDS on October, 7, 1985, states in relevant part:

## C. Nebraska's Foster Care Training Program

Nebraska Department of Health and Human Services ("NDHHS") employs protection and safety workers ("PSWs"), all of whom are expected to handle cases involving children who are eligible for or are candidates for foster care maintenance payments under Title IV–E. A.R. 492. PSWs also handle cases involving children receiving services under Title IV–B and children who are wards of the State. A.R. 491–92. Prior to assuming a caseload, NDHHS requires all newly hired PSWs to attend training at the University of Nebraska, which was specifically designed to comply with Title IV–E requirements. A.R. 491–94.

## D. Nebraska's Proposed Cost Allocation Plan

Effective July 1, 1993, DCA approved Nebraska's CAP, which included a provi-

Title IV–E funds for staff training may be used to train personnel employed or preparing for employment with the State agency only in relation to activities allowable in title IV–E (45 C.F.R. 1356.60(c)). These training costs may be charged to the title IV–E program in relation to personnel identified in 45 C.F.R. 1356.60(b)(1) who handle or will handle title IV–E caseloads or who have responsibilities specifically related to the title IV–E foster care program. If some of the trainees will not be involved in the title IV–E program, it would be necessary to allocate these training costs between title IV–E and non-title IV–E. In addition, for training, part of which is related to title IV–E and part of which is related to other programs, the State must have a reasonable method of allocating costs between title IV–E Foster Care and other programs. If, however, at least 85 percent of the training is directed toward title IV–E Foster Care, all of the training for eligible trainees and for trainers may be charged to title IV–E Foster Care.
A.R. 258.

sion stating that the cost of new worker training was directly charged to Title IV–E. A.R. 574, 578. DCA attempted to rectify the situation in 1996 by requiring Nebraska to change the provision and begin allocating costs to all the benefitting programs. Defs.' Mot. at 31. Nebraska submitted a new CAP in 1997 that was drafted in a manner so as to arguably support an interpretation that the method it employed under the 1993 CAP was still permitted. *Id.* Nebraska continued to direct charge Title IV–E exclusively. *Id.* On September 30, 1999, Nebraska submitted several proposed amendments to its CAP. *See* DAB Decision at 5 (A.R.5). The CAP Amendments included a provision stating that the direct and indirect costs of its foster care training will be directly charged to Title IV–E. *Id.* In response, DCA informed Nebraska that these training costs "must be allocated to all programs that benefit. Title IV–E can only be charged a portion of the costs." *Id.* After a series of communications between DCA and Nebraska, Nebraska agreed to amend its CAP based on the number of active cases in each program. A.R. 961 Appendix B. On June 13, 2000, Nebraska notified DCA that it was withdrawing its agreement to amend the plan. A.R. 963. After Nebraska declined to amend its cost allocation plan, DCA disapproved the foster care training portion of Nebraska's CAP. DAB Decision at 6 (A.R.6).

The DCA disapproval letter cited OMB Circular A–87 as authority for DCA's decision, referring to the provision stating that a "cost is allocable to a particular cost objective if the goods or services involved are changeable or assignable to such cost objective in accordance with relative benefits." OMB Circular A–87, Attach. A. ¶ C.3.a. The DCA disapproval letter also cited the three ACF transmittals, that require training costs to be allocated to all

benefitting programs. Decision 1882 at 6 (A.R.6).

### E. The DAB Decision

Nebraska appealed DCA's decision to the DAB. The issue before the DAB was whether DCA properly disapproved Nebraska's proposed CAP amendments on the ground that the cost of training must be allocated among all benefitting programs. As the Board noted, it had previously considered precisely the same issue in *Illinois Dept. of Children and Family Services,* DAB No. 1530 (1995), and ruled that DCA had properly required that Illinois' CAP provide for allocation of costs among all benefitting programs. DAB Decision at 8 (A.R.8). The *Illinois* decision was predicated upon the DAB ruling in *Oklahoma Dept. of Human Services,* DAB No. 963 (1988), holding that DCA had discretion to require a pro rata allocation of the costs of services to all benefitting programs.

In its analysis, the DAB noted that it was clear that there were other programs in the state that benefitted from the training. *See* DAB Decision at 8 (A.R.8). The DAB determined that in light of the circumstances in this case, its holding in *Illinois* was controlling. Thus, the DAB noted:

Illinois [here Nebraska] acknowledged that the costs in question benefitted both the title IV–E program and other public assistance programs. Moreover, Illinois was on notice well before the submission of its proposed CAP that it must allocate costs among all benefitting programs, even if the costs substantially benefitted title IV–E. Illinois acknowledged that this policy was clearly articulated in ACF–IM–91–15, dated July 21, 1991. . . . Illinois was also put on notice of this policy by DCA's November 12, 1987 letter approving Illinois' RMS,

which stated that ACYF policy required the application of eligibility ratios to allocate costs to IV–E. Thus, DCA properly required that Illinois' CAP provide for allocation of the costs to other benefitting programs in addition to title IV–E. A.R. 9. Defendants argue that Nebraska, like Illinois, was on notice of the same policy as is evidenced by its actions up to June 13, 2000. A.R. 564; *see also* A.R. 960–61, A.R. 975–76.

Because the DAB found that the rationale in *Illinois* was controlling, the DAB focused on responding to the arguments made by Nebraska in its filing. DAB Decision at 10–25 (A.R.10–25). The DAB's findings are summarized as follows:

1. *The ACF Transmittals Relied On By DCA In Disapproving Nebraska's Proposed CAP Amendment Were Not Required To Be Published Pursuant To Notice And Comment Rulemaking.*

The DAB rejected Nebraska's argument that the ACF transmittals were invalid because they were substantive rules that imposed a "new requirement that is 'not fairly encompassed' by OMB A–87, the title IV–E statute, and the title IV–E regulations" and thus should have been subjected to the notice and comment provisions of the APA. DAB Decision at 10 (A.R.10). The DAB also rejected Nebraska's alternative argument that the ACF transmittals constituted interpretive rules that represent a change in ACF's interpretation of its regulation. DAB Decision at 10–11 (A.R.10–11). The DAB explained that the transmittals were part of ACF's guidance system. DAB Decision at 12 (A.R.12). Citing its holding in *New York State Dept. of Social Services*, DAB No. 1358 (1992), the DAB found the ACF transmittals to be "general statements of policy" that do not substantively change

what a state is required to do in order to be entitled to FFP. DAB Decision at 12 (A.R.12). The DAB explained that it rejected the same argument made by Illinois stating:

ACF–IM–91–15 merely described the position ACF will take when DCA consults with ACF about allocation of costs to title IV–E. It did not change any rights of the states or imposed any new obligations on them because the title IV–E regulation provides that states may claim costs (including administrative and training costs) only in accordance with an approved CAP. . . . It was thus a general statement of policy . . .

DAB Decision at 11 (A.R.11).

2. *The Board Applied The Proper Standard In Illinois When It Held That DCA Could Properly Disapprove Illinois' Proposed CAP Based On ACF–IM–91–15 As Long As That Policy Was A Reasonable One.*

Nebraska argued that recent case law supported its position that the DAB could not defer to the "reasonable" policy relied on in ACF–IM–91–15. *See* DAB Decision at 13 (A.R.13). The DAB found that the two cases relied upon by Nebraska, *United States v. Mead Corporation*, 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) and *Christensen v. Harris County*, 529 U.S. 576, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000), were inapposite here. The DAB explained that both *Christensen* and *Mead*, which insert the issue of "persuasiveness" into the deference test under *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), require deference to a federal agency's interpretation only where the interpretation is contained in a document which has the force of law. DAB Decision at 14 (A.R.14). The DAB acknowledged that the ACF transmittals

did not have the force of law. Moreover, *Mead* and *Christensen* involved interpretations of "ambiguous language in statutes or regulations." DAB Decision at 14 (A.R.14). The DAB found that instead of resolving ambiguity in a statute or regulation, the ACF transmittals "constitute statements of policy as to how ACF believes HHS should exercise its discretion under OMB Circular A–87 to determine whether training costs should be allocated to all benefitting programs, rather than allocated solely to title IV–E. Accordingly, DCA need not demonstrate that this policy was 'persuasive' rather than 'reasonable' in order for it to be applicable here." *Id.*

### 3. Nebraska Failed To Show That The Policy In The ACF Transmittals Is Inconsistent With Congressional Intent In Enacting Title IV–E.

Nebraska's next argument was that the ACF transmittals at issue here were inconsistent with Congress' desire to improve the overall foster care system. DAB Decision at 14 (A.R.14). Nebraska relied heavily on the draft notice of proposed rulemaking that claimed "the intent of Congress in providing a legislative base for an enhanced match for training is to staff the title IV–E program with more highly qualified workers." The DAB, noting that the draft notice was never adopted, found "no basis for reading this as a statement that Congress intended title IV–E payments to benefit foster care generally." DAB Decision at 15 (A.R.15). Moreover, the DAB reasoned that even if Congress' intent was to improve foster care, it does not mean that Congress determined that states were entitled to have their training funded at 75% regardless of whether other programs benefitted. *Id.* The DAB noted that it addressed similar arguments with the same result in *Illinois* and *New York.*

### 4. Even If Nebraska Once Had An Approved CAP That Permitted It To Allocate All Foster Care Training Costs Exclusively To Title IV–E, That Is Not A Basis For Finding That Nebraska Was Entitled To Continue To Allocate Its Costs In This Manner.

Nebraska argued, as did Illinois before it, that it was entitled to continued approval of the previously approved cost allocation methodology in its 1993 CAP. Nebraska noted that once approved by DCA, a CAP may continue in effect indefinitely if the state submits an annual statement to DCA certifying that the CAP is not outdated. DAB Decision at 16–17 (A.R.16–17). The DCA has acknowledged that it was mistaken in its prior approval of Nebraska's CAP. DAB Decision at 17 (A.R.17). Moreover, the DAB notes that it has held that the DCA "may require a state to amend an approved CAP if 'a material defect is discovered in the cost allocation plan by the Director, DCA or the State.' 45 C.F.R. § 95.509(a)(2)." Here, the DAB found that the defect was that the plan was inconsistent with ACF policy.

### 5. Nebraska's Other Arguments That It Should Have Been Permitted To Allocate The Training Costs Solely To Title IV–E Have No Merit.

Nebraska suggests that the training provisions of Title IV–E permit states to allocate foster care training costs exclusively to Title IV–E. The DAB found "that the statutory provisions cited by Nebraska have no direct bearing on the allocation issue in this case because they concern who is *eligible* to receive training." DAB Decision at 18 (A.R.18) (emphasis in original). The DAB noted that DCA did not dispute that the cost of PSWs training would be permitted under Title IV–E, but

rather, the DCA disputed whether the cost should be allocated among all the benefitting programs. *Id.*

Nebraska argued that because the Title IV–E program is included in the state's training plan for Title IV–B, the Title IV–E funds may be used to provide training to any state agency worker who works with children in one of these plans. DAB Decision at 18 (A.R.18). The DAB observed that there is no language that suggests that Title IV–E should bear all the costs. DAB Decision at 19 (A.R.19).

Nebraska argued that OMB A–87 allows it to shift training costs from Title IV–B to Title IV–E. *Id.* The DAB found that OMB A–87 requires that "cost shifting be 'in accordance with existing program agreements.' In this case, of course, program issuances by ACF did not permit the cost shifting referred to by the Circular." DAB Decision at 20 (A.R.20).

Nebraska argued that placement of the requirement that the state's CAP "identify which costs are allocated and claimed" under Title IV–E at 45 C.F.R. § 1356.60(c), meant that "the IV–E regulations intended states to charge all training costs directly to title IV–E." *Id.* The DAB pointed out that Nebraska ignored § 1356.30(c), which makes the provision on cost allocation applicable to Title IV–E generally. Thus, the DAB found, "the omission from the subsection on training costs of a reference to cost allocation similar to that which appears in section 1356.60(c) ... appears to be inadvertent." DAB Decision at 20–21 (A.R.20–21).

Nebraska argued that states are permitted to allocate costs solely to Title IV–E because it was originally tied to funding under the former Title IV–A foster care program. DAB Decision at 21 (A.R.21). The DAB noted that cost allocation under Title IV–A is not relevant. *Id.* The DAB found that under Title IV–A there was a provision that provided "that title IV–A 'may be considered to be primarily benefitted if the number of AFDC children served represents at least 85 percent of the total children served.' In this case, however, the number of IV–E children served was less than a quarter of the total children served." DAB Decision at 22 (A.R.22).

Nebraska argued that it should be permitted to allocate its training costs exclusively to Title IV–E because its regulations authorize the withholding of 10% of a state's claim for Title IV–E administrative costs if the state is not in substantial conformity with the system factor of "operating a staff development and training program." *Id.* Thus, training is mandated. The DAB, having addressed these arguments in prior published decisions in 1981 and 1999, noted that Nebraska was clearly on notice. Thus, the DAB concluded that even if Nebraska has to use state funds to provide PSW training, it is not a basis for reversing the DCA's determination to disapprove a CAP amendment. DAB Decision at 23 (A.R.23).

6. *Nebraska Did Not Show That Using Either Caseload Statistics Or Time Studies Is An Inequitable Basis For Allocating Training Costs Among All Benefitting Programs.*

Nebraska argued that even if costs must be allocated, neither caseload nor time studies are equitable. DAB Decision at 23 (A.R.23). While the DAB noted that DCA has acknowledged that these methods are not exact, the DAB found that because Nebraska has not established that these methods are inequitable and has not proposed another method for allocation between the benefitted programs, then "the DCA may require that Nebraska allocate its training costs based on either caseload or time studies unless the parties agree on

another basis not yet identified." DAB Decision at 24–25 (A.R.24–25).

### F. The Current Situation

Under DAB Decision 1882, Nebraska will be required to allocate the costs of its foster care training amongst all benefitting programs. Nebraska claims that this will decrease federal support of its training programs from 75% to 16% of total training expenses. Pl.'s Mot at 10. Further, HHS has already asked Nebraska to repay the "excess" amount it has claimed under its disputed CAP since the plan's 1999 proposed effective date. *See* Pl.'s Mot. Ex. A Declaration of Willard Bouwens at ¶ 3. At the time the Summary Judgment Motions were filed, HHS had calculated this amount to be $7.7 million. *Id.* at ¶ 4.

Nebraska claims that if it is denied access to this federal funding for foster care training costs and is required to pay back funds, it will be unable to afford to continue the training and may be forced to cut services and personnel. *Id.* at ¶ 7, 9, and 5. Further, Nebraska asserts that many untrained PSWs lack the specialized knowledge and skills necessary to administer Title IV–E programs in accordance with the standards. Osbourne Decl. ¶ 9.

### III. Standard Of Review

██ Under the Administrative Procedures Act, the standard of review for resolving a challenge to final agency action is that agency action should be set aside if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see American Public Communications Council v. FCC,* 215 F.3d 51, 55 (D.C.Cir.2000). The "scope of review under the 'arbitrary and capricious' standard is narrow," and the lower courts may not "substitute [their] judgment for that of an agency." *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Ins. Co.,*

463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). The district court's review of an agency decision is highly deferential. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Agency action enjoys a "presumption of regularity" and a plaintiff faces a heavy burden in establishing that an agency's conduct violates this standard. *Id.* at 415.

Normally, in finding arbitrary and capricious action, courts find that "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Manufacturers Ass'n,* 463 U.S. at 43, 103 S.Ct. 2856.

The D.C. Circuit has noted, "we must affirm the [agency's] rules if the agency has considered the relevant factors and articulated a rational connection between the facts found and choices made." *American Public Communications Council,* 215 F.3d at 53, quoting *Motor Vehicle Manufacturers Ass'n,* 463 U.S. at 43, 103 S.Ct. 2856. Deference to agency determination is particularly important where the determination involves application of the agency's particular expertise. *National Treasury Employees Union v. Horner,* 854 F.2d 490, 498 (D.C.Cir.1988).

██ However, whether an agency decision is entitled to deference "depends on whether the agency's conclusion is based on factual interpretations or is purely a question of law." *Beverly Enterprises Inc. v. Herman,* 130 F.Supp.2d 1, 12 (D.D.C. 2000). "If an agency's finding concerns a purely legal question . . . the court reviews the finding *de novo* to ensure the agency does not exceed its authority." *Id.* at 13 (reviewing the legal standard used by the

agency in deciding whether there was probable cause for the Fourth Amendment claim); *see also Massachusetts v. Sec'y of Health and Human Services,* 816 F.2d 796, 801 (1st Cir.1987) (in APA review where a state asks the court to set aside agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," the court "accept[s] the facts as stated by the Secretary, as long as they are supported by substantial evidence, and decide[s] all questions of law *de novo* ").

At the outset, the Court notes that whether the policy stated in the ACF transmittals constitute a legislative rule, an interpretative rule, or a general statement of policy; and whether the Supreme Court's holding in *United States v. Mead Corporations,* 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) and *Christensen v. Harris County,* 529 U.S. 576, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) apply to a review of the ACF transmittals, are conclusions of law that are subject to *de novo* review. *See Arizona v. Thompson,* 281 F.3d at 254 (noting that the questions of whether benefitting program allocation is required by the authorizing statute is a question of law, which the court must review *de novo*, but recognizing the agency's discretion to make other determinations including determinations regarding cost allocation); *Office of Communication of the United Church of Christ v. FCC,* 707 F.2d 1413, 1423 n. 12 (D.C.Cir.1983) (noting that when determining whether the Commission has acted within its legally delegated authority, the APA appears to require *de novo* review of all questions of law).

## IV. Discussion

### A. It Is Not Clear To The Court That The ACF Transmittals Frustrate The Congressional Objective Of Title IV-E.

Courts should intervene when an agency does not "reasonably accommodate the policies of a statute or reaches a decision that is 'not one that Congress would have sanctioned.' " *Natural Resources Defense Council v. Herrington,* 768 F.2d 1355, 1383 (D.C.Cir.1985).

Plaintiff cites legislative history for the proposition that the training cost 75% enhanced level of federal funding was designed as a financial incentive for the states to ensure the viability of their foster care systems. Pl.'s Mot. for Summ. J. 14. Plaintiff argues that the incentive is taken away if states must allocate the cost of child welfare training amongst all benefitting programs. Further, plaintiff contends that cost sharing will interfere with planning for future training because plaintiff will be unable to forecast what percentage of the caseload will be Title IV–E cases. However, Nebraska had conceded in their brief to the DAB that "[t]he legislative history of Pub.L. No. 96–272 does not specifically explain why Congress chose to reimburse 75% of the costs of training State agency staff." DAB Decision at 15 (A.R. 15).

Plaintiff claims that ACF officials seem to acknowledge that a cost allocation technique may not be appropriate where it would be inconsistent with Congressional intent. Plaintiff opines that ACF's recognition of this fact led high-level ACF officials to recommend an amendment to Title IV–E that would explicitly state that training could be directly charged to Title IV–E, reimbursable at 75%. Plaintiff maintains that this recommendation was made in a draft of a notice of proposed rulemaking sent by the acting ACF Commissioner to the Assistant Secretary for Children & Families. The draft rule would only allocate costs when the subject matter was clearly not related to child welfare. The draft rule was never published. Neverthe-

less, plaintiff argues that a draft rule may "constitute the Secretary's authoritative administrative interpretation of the governing statute." *Vanscoter v. Sullivan,* 920 F.2d 1441, 1449 (9th Cir.1990). Plaintiff contends that defendants' failure to promulgate the rulemaking proposal that ACF believed was necessary to conform to congressional intent was arbitrary and capricious. *See Environmental Def. Fund v. EPA,* 852 F.2d 1316 (D.C.Cir.1988).

However, since ACF never published the draft notice of proposed rulemaking, it is not clear to the Court that the agency ever held that position. It is equally plausible that after the draft notice was circulated, the agency was persuaded that it should not adopt the prescribed position. Even if the agency did believe that the cost should be direct charged to Title IV–E to conform to congressional intent, the DAB correctly gave little weight to Nebraska's attempt to rely on the draft notice because it is not an authoritative statement of what *Congress* intended when enacting Title IV–E. The Court finds that plaintiff was correct to concede before the DAB that the reason for the 75% reimbursement was not clear in the legislative history. Thus, this Court finds that the agency has not operated in an arbitrary and capricious manner which is clearly in contravention of Congress' intent.

Even if Congress intended to provide federal funding participation at the rate of 75% for Title IV–E training as an incentive to improve foster care training, it does not follow that Congress intended to fund *all* child welfare worker training under Title IV–E. Other sources of funding, such as Title IV–B, are available for such training.

The DAB made this point in *New York Dept. of Social Services,* DAB No. 1588 (1996), where it upheld a disallowance of costs claimed as foster care and adoption assistance administrative costs for nurses:

The federal government may participate in funding different types of child welfare programs, but states retain primary responsibility for the safety and welfare of the children who live within their jurisdictions. In light of this fact, Congress did not intend, in enacting title IV–E, that the federal government would assume the responsibility for overall funding of child welfare programs. DAB No. 1482, at 14, citing staff of House Comm. on Ways and Means, 102d Cong., 2d Sess., Overview of Entitlement Programs 839 (Comm. Print 1992); DAB No. 1530, at 30. Title IV–E, therefore, is a program of limited purposes; its primary component involved funding maintenance payments for foster care children who would otherwise be eligible for AFDC under title IV–A. Thus, title IV–E was never intended to share in those costs incurred in carrying out a state's fundamental responsibility to protect and ensure the safety of its children which would have been incurred even if title IV–E did not exist.

*Id.* at 10–11.

Plaintiff argues that defendants mischaracterize its CAP amendment. In *New York v. Shalala,* the DAB disapproved New York's CAP because it found that some of the activities New York sought to charge Title IV–E "were not directly related to [Title IV–E] program objectives." 1998 WL 150955, *14 (S.D.N.Y.1998). Here, the DAB found that Nebraska's training program provides skills and knowledge that are "directly relevant to Title IV–E program." DAB Decision at 7 (A.R.7).

However, the DAB noted that "in the absence of evidence of a broader statutory intent, ACF's policy need only be consistent with the purpose stated in section 474(a)(3) of the Act, which provides for

funding of training expenditures 'found necessary by the Secretary ... for the proper and efficient administration of the State plan....'" DAB Decision at 16 (A.R.16). The DAB found that ACF's requirement of cost allocation is not inconsistent with Congressional intent.[7] The Court finds that the DAB's conclusion in this regard is not arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law.

**B. Plaintiff Argues That The DAB Improperly Deferred To The Three ACF Transmittals Noted In Decision 1882.**

The DAB upheld the policy stated in the ACF transmittals, which required cost allocation to all benefitting programs, because it was "not unreasonable." Decision 1882 at 1 (A.R.1). In doing so, the DAB rejected Nebraska's rationale for allocating PSW training costs entirely to Title IV–E as inappropriate on the grounds that would "result in allocating training costs exclusively to IV–E." DAB Decision at 25 (A.R.25). Plaintiff argues that deference to the ACF transmittal policy was inappropriate.

*1. Nebraska Argues That If The ACF Transmittals Are Informal Policy Statements, Then They Are Not Entitled To Deference.*

■ Informal policy statements are not entitled to *Chevron* deference. *United States v. Mead Corp.*, 533 U.S. 218, 234, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). Agency interpretations that set out informal policy statements are entitled to respect under *Skidmore v. Swift*, but only to the extent that they have the "power to

persuade." *Christensen v. Harris County*, 529 U.S. 576, 596, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000)(citing *Skidmore v. Swift*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)). The power to persuade is determined by the thoroughness in consideration, validity of reasoning, and consistency with earlier pronouncements. *Skidmore*, 323 U.S. at 140, 65 S.Ct. 161. Plaintiff argues that since the ACF transmittals do not have the elements as discussed by the Court in *Skidmore*, they do not have the power to persuade and should not be afforded deference.

When the DAB reviewed this issue, it was not persuaded that *Christensen* and *Mead* were relevant to this situation. Here, the DAB found that the ACF transmittals did not interpret a statute or regulation but rather stated the policy regarding how ACF would exercise its discretion under OMB Circular A–87. DAB Decision at 14 (A.R.14).

However, defendants argue that *Chevron*, *Christensen*, and *Skidmore* are not relevant here because these cases involve deference to an agency's interpretation of a statute while this case involves an agency's interpretation of a regulation that the agency itself has passed. *See Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945). Like *Chevron*, *Seminole Rock* reflects a similar understanding of an agency's authority to resolve ambiguities, but unlike *Chevron*, it reflects the notion that the agency that has promulgated the regulation is in the best position to understand what the regulation means. *Id.* Thus, according to the *Seminole Rock* Court, the agency's interpretation of its own regulation should prevail unless it is plainly at

7. Moreover, both parties appear to agree that while OMB A–87 does not compel allocation to all benefitting programs, as the DAB explained "federal agencies have discretion under the Office of Management and Budget ("OMB") Circular A–87 to require states to allocate costs to all benefitting program." DAB Decision at 1 (A.R. 1).

odds with the regulation's text. The interpretation "becomes controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Seminole Rock*, 325 U.S. at 414, 65 S.Ct. 1215.

Although plaintiff and defendants agreed that the DAB applied *Chevron* deference in its analysis, the Court is not convinced. While the defendants' reading of *Seminole Rock* is correct, defendants take a position contrary to the position announced by the DAB. Defendants claim that the ACF transmittals interpret an ambiguous agency regulation, however, the DAB's position was that the transmittals are statements of agency policy explaining how ACF thinks that HHS should exercise its discretion. This difference is significant.

In reaching its conclusion that *Mead* and *Christensen* do not apply, the DAB cited its decision in *Illinois* and stated that the ACF transmittals simply need to be reasonable. While "reasonable" is the *Chevron* standard, reasonableness is the second prong of the *Chevron* analysis. First, a court must determine that there is an ambiguity.

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific

issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 843–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Here, the DAB was clear—there is no ambiguity:

The only statute or regulation pertaining to the allocation of costs that is cited in the ACF issuances is 45 C.F.R. 1356.60(c), which states in pertinent part that a state's 'cost allocation plan shall identify which costs are allocated and claimed under this program.' *This directive to identify the costs being allocated contains no ambiguity that is clarified by the instructions in the ACF issuances* specifying how costs are to be allocated.

DAB Decision at 12 (A.R.12)(emphasis added). The DAB reiterates this point in explaining why it finds that *Mead* and *Christensen* do not apply:

Those cases involved agency interpretations of *ambiguous language* in statutes or regulations. *Here, however*, as discussed above, the ACF issuances constitute statements of policy as to how ACF believes HHS should exercise its discretion under OMB Circular A–87 to determine whether training costs should be allocated to all benefitting programs, rather than allocated solely to title IV–E.

DAB Decision at 14 (A.R.14)(emphasis added). In making this distinction, the DAB is clearly not interpreting ambiguous language. Hence, since the DAB found no ambiguity, the DAB had no opportunity to apply *Chevron*.

The Court finds it even more telling that while the DAB cites its *Illinois* decision in applying the "reasonable" standard, the Illinois DAB does not even mention, much less cite, *Chevron*. In describing ACF–IM91–15, the *Illinois* decision states:

It was thus a general statement of policy which was excepted from the notice and comment procedures. 5 U.S.C. 533(b)(3)(A)... Thus, as long as the policy in ACF–IM–91–15 was a reasonable one (which we find it was), DCA could properly disapprove Illinois' proposed CAP based on that policy.

*Illinois* DAB Decision at 37 (1995 HHSDAB LEXIS 914). The DAB did not explain in *Illinois* or *Nebraska* from where its "reasonable" standard was derived.

At this juncture, the Court is unclear as to the origin of the standard the DAB applied and this Court should not be required to guess. While the Court's review of this legal issue is de novo, the lack of clarity has deprived the Court of all parties' best thoughts on this issue. Because of this lack of clarity and because this matter will ultimately be resolved on another basis, the Court shall not weigh in on this argument.

*2. The ACF Transmittals Do Not Conflict With The Agency's Prior Position With Regard to Title IV–A.*

▉▉▉ Plaintiff argues that HHS never articulated a basis for the reason it departed from its original position allowing for primary program allocation. If an agency decides to act in a manner inconsistent with the manner in which it previously acted, it "must cogently explain why it has exercised its discretion in a given manner" and must "supply a reasoned analysis" when it changes course. *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 42, 48, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *see also Good Samaritan Hosp. v. Shalala,* 508 U.S. 402, 417, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993).

Plaintiff argues that in the original Title IV–E regulation, each state's allotment was determined by adjusting the expenses incurred for maintenance, training and other administrative activities under the former Title IV–A program during 1978, the "base year." *See* former 42 U.S.C. §§ 674(b)(4) & (b)(4)(C) (1991). Under the Title IV–A foster care regulations in effect in 1978, states were required to conduct training activities and were authorized to allocate expenses between the two programs, or charge the entire costs to one program if it was the primary beneficiary. *See* 45 C.F.R. §§ 220.10 & 220.63(b) (1977).

Plaintiff argues that by incorporating the state's expenditures for training under Title IV–A, HHS allowed primary program allocation in the original Title IV–E regulation, 45 CFR § 1356.65(a)(3)(iii)(A)-(B) (1999). Plaintiff argues that the ACF transmittals conflict with *this* prior position. Further, plaintiff notes that 45 CFR 1356.65 was still in effect when the ACF transmittals were issued. Therefore, plaintiff argues that since the ACF transmittals conflicted with the Title IV–E regulation when they were issued, they are entitled to no weight.

Moreover, plaintiff argues that because defendants' original Title IV–E regulation relied on states' training expenditures under Title IV–A, which allowed the primary program approach, the interpretation of what was permissible under Title IV–A, embodied in Title IV–E regulations, is entitled to *Chevron* deference. *See Barnhart v. Thomas,* 540 U.S. 20, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003)(affording deference to agency regulation that reasonably interprets that statutory language).

While the statute provided for a limit on each state's Title IV–E allotment based on the state's former Title IV–A expenditures, the DAB explained that cost allocation under Title IV–A is not relevant for cost allocation under Title IV–E. The DAB noted that

HHS adopted the primary program approach [under Title IV–A] as a matter of expediency because eligibility for the three principal public assistance programs—AFDC (including Title IV–A foster care), Medicaid, and Food Stamps—was based on a single eligibility determination, funding for the program was open-ended, and the federal matching levels for administrative costs were the same for all three programs. A.R. 21. The DAB explained that while states would receive the same net amount of federal funds for administrative costs regardless of which cost allocation method was used under Title IV–A, the same is not true under Title IV–E.

It appears to the Court that the DAB considered plaintiff's argument but disagreed that the reference to Title IV–A incorporated the cost allocation methods that were previously employed in that program. The DAB did not act arbitrarily and capriciously in this regard.

**C. The DAB Was Incorrect In Finding That The ACF Transmittals Were Neither Substantive Rules Nor Changed Interpretive Rules.**

 Plaintiff contends that if the ACF transmittals constitute substantive rules, then they were adopted in violation of the APA. Rules adopted in violation of the APA are invalid. *United States v. Picciotto*, 875 F.2d 345, 346 (D.C.Cir.1989). Alternatively, plaintiff argues that ACF changed its interpretation of its training cost regulation, or interpretive rule, without notice and comment. Changing the interpretation of a regulation requires a notice and comment period. *Paralyzed Veterans of America v. D.C. Arena*, 117 F.3d 579, 586 (D.C.Cir.1997).

Defendants maintain that the DAB correctly analyzed and rejected both of Nebraska's theories on the basis that the ACF transmittals are general statements

of policy and are not substantive rules or interpretive rules that have changed. DAB Decision at 10–12 (A.R.10–12).

*1. The ACF Transmittals Have Been Applied As A Substantive Rule.*

 The APA notice-and-comment rulemaking requirement applies when an agency adopts a substantive rule, but does not apply when an agency issues "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(3)(A). The DAB held that the ACF transmittals represent only general statements of policy that are not subject to APA requirements. Decision 1882 at 12 (A.R.12). In *Pacific Gas and Electric Co. v. Federal Power Comm'n*, 506 F.2d 33, 38–39 (D.C.Cir. 1974), the D.C. Circuit provided an explanation of the difference between a substantive rule and a general statement of policy:

> A properly adopted substantive rule establishes a standard of conduct which has the force of law. In subsequent administrative proceedings involving a substantive rule, the issues are whether the adjudicated facts conform to the rule and whether the rule should be waived or applied in that particular instance. The underlying policy embodied in the rule is not generally subject to challenge before the agency.
>
> A general statement of policy, on the other hand, does not establish a "binding norm." It is not finally determinative of the issue or rights to which it is addressed. The agency cannot apply or rely upon a general statement of policy as law because a general statement of policy only announces the agency's tentative intentions for the future. When the agency applies the policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued. An

agency cannot escape its responsibility to present evidence and reasoning supporting its substantive rules by announcing binding precedent in the form of a general statement of policy. . . .

When the agency states that in subsequent proceedings it will thoroughly consider not only the policy's applicability to the facts of a given case but also the underlying validity of the policy itself, then the agency intends to treat the order as a general statement of policy. *Id.* at 38–39. By contrast, "[i]f it appears that a so-called policy statement is in purpose or likely effect one that narrowly limits administration discretion, it will be taken for what it is, a . . . rule of substantive law." *American Bus. Ass'n v. United States,* 627 F.2d 525, 529 (D.C.Cir.1980).

 Whether an agency policy constitutes a rule subject to APA requirements is a questions of law reviewed *de novo. Hemp Industries Ass'n v. DEA,* 333 F.3d 1082, 1086 (9th Cir.2003). *De novo* review means that a reviewing court is permitted to "make its own findings." *FTC v. U.S. Roofing Corp.,* 853 F.2d 458, 461 n. 5 (6th Cir.1988).

 It appears to this Court that the policy in the ACF transmittals were given the effect of a rule by the DAB.[8] In its analysis, the DAB neither applied the ACF transmittals to Nebraska's factual situation in making its determination nor analyzed the underlying validity of the policy.

*See Pacific Gas & Electric Co.,* 506 F.2d at 38–39. Rather, the DAB applied the policy in the ACF transmittals improperly as if it were law. The DAB did not consider *de novo* whether the evidence Nebraska presented (e.g. testimony that all PSWs handle Title IV–E cases, that each aspect of Nebraska's training was designed to meet Title IV–E program requirements, and that Nebraska law does not require training for workers who manage the State ward program) justifies Nebraska's use of a primary program allocation. A policy that adds a requirement not found in the relevant statute and regulation is a substantive rule that is invalid unless it is promulgated with notice and comment. *See U.S. v. Picciotto,* 875 F.2d 345, 348 (D.C.Cir.1989). OMB Circular A–87 and Title IV–E itself do not prohibit allocating all foster care training costs to Title IV–E, and would permit DCA and ACF to approve the allocation of training costs entirely to Title IV–E.

Defendants acknowledge that at least one court has held that ACYF–PA–87–05 is valid even though it was not promulgated as a regulation. *See New York Dep't of Social Services v. Shalala,* 1998 WL 150955 (S.D.N.Y.1998). In *New York,* the court considered whether ACYF–PA–87–05 was a substantive rule or an interpretive rule. The *New York* court found that the provisions of ACYF–PA–87–05 fulfilled the "classic interpretive function typically performed by federal agencies" by defin-

---

8. Other cases have found that binding rules governing how costs must be allocated are subject to APA rulemaking requirements. *See, e.g., National Association of Regulatory Utility Commissioners v. Dep't of Energy,* 851 F.2d 1424, 1430 (D.C.Cir.1988)(observing, in a case pertaining to a DOE announcement of a method for allocating the costs of developing and operating nuclear waste repositories between the government and commercial producers, that the question whether notice-and-comment rulemaking was required turned to a large degree on whether the cost allocation methodology that the agency prescribes has a "present binding effect" on the utilities); *Mobil Oil Corp. v. Dep't of Energy,* 728 F.2d 1477 (Temp.Emer.Ct.App.1983) (upholding a DOE rule requiring that oil refiners pass through increases product costs among all classes of purchasers, even though the rule was adopted without notice and comment, because the circumstances qualified for emergency exception to APA rulemaking requirement).

ing the children for whom administrative expenses are reimbursed. *Id.* at 21–22. As an interpretative rule, ACYF–PA–87–05 was valid without notice and comment.

However, this Court does not find the *New York* decision persuasive. The *New York* court held that the policy *with regard to the costs of investigating all reports of child abuse* was an interpretation of the Title IV–E regulation. This part of the holding has no relevance to whether the policy regarding cost allocation is being applied as a substantive rule.

In support of its finding that the ACF transmittals were general statements of policy, the DAB noted that a general statement of policy does not substantively change what a state is required to do to in order to receive federal financial participation. In *Illinois Department of Children and Family Services*, DAB No. 1530 (1995), the DAB held that "ACF–IM–91–15 merely described the position ACF will take when DCA consults with ACF about allocation of costs to title IV–E. It did not change any right of the state or impose new obligations on them. ..." *Id.* at 20. However, this Court is not persuaded by the *Illinois* decision. The ACF transmittals' policy forbidding primary program cost allocation to Title IV–E unless it is the only benefitting program *does* impose a substantive limitation on the amount of federal Title IV–E funds a state may claim—a limitation that goes beyond the requirement that a state must have an approved CAP.

The Court is also concerned that defendants do not attempt to show how the DAB's ruling that the ACF transmittals are general statements of policy can be squared with the D.C. Circuit's holding in *Pacific Gas & Elec. Co. v. Federal Power Comm'n*, 506 F.2d 33, 38–39 (D.C.Cir. 1974). As the D.C. Circuit noted, when an agency applies a general statement of poli-

cy in a particular situation, "it must be prepared to support the policy just as if the policy statement had never been issued." *Id.* at 38–39. Here, the DAB did not treat the ACF issuances as general statements of policy; after outlining Nebraska's argument as to why it is equitable to charge the training costs directly to Title IV–E, the DAB rejected Nebraska's approach on the grounds that it violated the policy described in the ACF transmittals and plaintiff did not suggest an alternative allocation method. A.R. 25.

Moreover, this Court is unwilling to view the ACF transmittals as general policy statements because ACF is part of the agency charged with administering the Title IV–E program. Transmittals that "merely describe the position ACF will take when DCA consults with ACF about allocation of costs to title IV–E" amount to binding rules, because DCA must consult with ACF every time they process a CAP proposal that calls for an allocation of costs to Title IV–E. *See* 45 C.F.R. § 95.511(a). A statement describing the position that ACF will take, without exception or qualification, every time it is consulted, and which functions as a roadblock to approval of any cost allocation plan that allocates foster care training costs entirely to Title IV–E, is more than a general statement of policy. *Cf. National Park Hospitality Ass'n v. Department of Interior*, 538 U.S. 803, 123 S.Ct. 2026, 2031, 155 L.Ed.2d 1017 (2003) (where an agency did not administer the statutory scheme in issue, its policy statement setting out its views was a general statement of policy).

When an agency adopts general requirements applicable to all, it must publish a notice of proposed rulemaking and allow notice and comment. *See U.S. v. Picciotto*, 875 F.2d 345, 348 (D.C.Cir.1989) (holding that the Park Service could not impose substantive restrictions on demonstrators

without engaging in a notice and comment period). Moreover, in *Pickus v. U.S. Board of Parole*, the D.C. Circuit held that guidelines specifying the factors the Board of Parole would consider "in the exercise of its discretion to parole eligible federal prisoners" were substantive and not exempt from notice and comment rulemaking because the guidelines "were of a kind calculated to have a substantial effect" on the parole board's ultimate decision and were "formula like." 507 F.2d 1107, 1112, 1113.

Further, this Court is bound to follow the D.C. Circuit's recent pronouncement in *CropLife America v. EPA*, 329 F.3d 876 (D.C.Cir.2003). In that case, the court found that the EPA previously had a practice of considering third-party human data on a case-by-case basis when evaluating the safety of pesticides. Then, in December 2001, the EPA issued a press release noting that it would no longer consider any human studies in its regulatory decision making. *Id.* at 878. The agency argued that the press release was "nothing more than a policy statement," which was not subject to notice-and-comment rulemaking. *Id.* at 883. The D.C. Circuit, however, found that the press release "constitutes a binding regulation." *Id.* at 882. The court reasoned that "an agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicated it is binding." *Id.* at 881. The EPA directive was binding "because EPA has made it clear that it simply 'will not consider' human studies." *Id.* As the directive did not "genuinely leave[ ] the agency and its decision-makers free to exercise discretion," it was not a mere policy statement but was instead a rule adopted without notice and comment. *Id.* at 883.

Here, it is clear to this Court that the ACF transmittals both appear to be binding on their face and are being applied by the agency as a binding rule. In applying the ACF transmittals, the agency decisionmakers neither had discretion nor attempted to exercise it. Thus, this Court finds that the ACF transmittals are binding rules.

When a court finds that a general statement of policy is on its face a binding rule or applied as a binding rule, the D.C. Circuit instructs that the proper course of action is to reinstate the agency's previous practice unless and until it is replaced by a lawfully promulgated regulation. *Id.* at 879, 885. Thus, this Court shall adopt the same course of action, and reinstate the agency's previous practice of approving primary program cost allocation plans unless and until it is replaced by a lawfully promulgated regulation.

*2. The Agency Impermissibly Changed Its Interpretation Of Its Regulation, Known As An Interpretive Rule, Without Notice And Comment.*

According to the D.C. Circuit, "once an agency gives its regulations an interpretation, it can only change that interpretation as it would formally modify the regulation itself; through the notice and comment period." *See Paralyzed Veterans of America v. D.C. Arena L.P.*, 117 F.3d 579, 586 (D.C.Cir.1997).

The DAB rejected Nebraska's argument that the agency changed its interpretation of its regulation because the DAB found that the transmittals were general statements of policy rather than an interpretive rule.

In doing so, the DAB noted that the language of the statute and regulation is not ambiguous and needed no interpretation. *See* DAB Decision at 14 (A.R.14). The only statute or regulation cited in the ACF transmittals, which pertains to cost

allocation, is 45 C.F.R. § 1356.60(c). This provision requires that the state's plan identify which costs are claimed under Title IV–E. The DAB found that:

> This directive to identify the costs being claimed contains no ambiguity that is clarified by the policy instructions specifying how costs are to be allocated between Title IV–E and other programs. Nor is there any language in either the general provision on cost allocation in 45 C.F.R. Part 95 or in OMB Circular A–87 which the ACF issuances could be viewed as interpreting.

A.R. 12. Defendants contend that the transmittals simply confirmed the cost principles in Circular A–87. Defs.' Reply at 7.

Moreover, defendants attempt to distinguish the *New York* court's decision that ACYF–PA–87–05 is an interpretive rule because: (1) the *New York* court did not consider whether the ACF transmittals were a general statement of policy, but rather only considered the distinction between substantive and interpretative rules and (2) unlike the eligibility requirements considered by the court in *New York*, the provisions in ACYF–PA–87–05 regarding cost allocation are not an interpretation of a statute or regulation. Defendants argue that the same is true for ACYF–PA–90–01 and ACF–IM–91–15. Defs.' Mot. at 20.

Although defendants argued that there was no ambiguity in the regulation that needed interpreting, ACF–IM–91–15 states that it was "confusion as to whether training costs ... should be allocated among all benefitting programs" that necessitated its issuance. A.R. 788A. For at least 11 years after the 1980 enactment of Title IV–E, the training cost allocation plan that ACF now embraces was not clearly articulated.

Defendants maintain that Nebraska cannot identify any policy documents that un-equivocally allow the primary program approach. Defs.' Mot. at 21. Defendants aver that none of the documents which Nebraska cites to present the "fair and considered judgment" that can constitute authoritative departmental positions. *See Paralyzed Veterans*, 117 F.3d at 587.

Whether the documents conveyed authoritative agency policy is a mixed question of law and fact. As to mixed questions of law and fact, the standard of review depends on the "mix" of the question. *U.S. v. Drew*, 200 F.3d 871, 880 (D.C.Cir.2000). Where the facts "are not significantly in dispute, the issue is primarily a question of law and therefore review closer to the *de novo* standard is required." *Id.* Here, the facts are not in dispute and legal questions clearly predominate. For example, there is no dispute about the authenticity of the 1985 memorandum or that its author was ACF Commissioner Livingston, head of the agency that was responsible for the administration of the Title IV–E program. Thus, whether the policy statement by the Commissioner conveyed agency policy is a question of law subject to *de novo* review. *See Mason General Hospital v. Sec'y of HHS*, 809 F.2d 1220, 1224, 1228 (6th Cir.1987) (court saw no reason to remand the case to the administrative Board to resolve questions of law, and went on to make findings about "the existence and duration of a prior settled regulation or practice" and the extent to which the rule "constituted a substantial change in such settled practice"); *Paralyzed Veterans of America v. D.C. Arena L.P.*, 117 F.3d 579, 587 n. 6 (D.C.Cir.1997) (finding *de novo* that the "speech of a mid-level official of an agency" is not the sort of statement that can be thought of as an "authoritative departmental position").

The 1985 ACYF policy memorandum from ACF Commissioner Livingston, which states that training primarily directed toward the requirements of Title IV–E may be charged to Title IV–E, contains citations to ACF's Title IV–E regulation found at 45 C.F.R. § 1356.60. A.R. 258. This indicates to the Court that HHS's 1985 interpretation approved primary program cost allocation. This Court knows of no reasons to suspect that the 1985 interpretation as expressed by the Commissioner of ACF does not reflect the agency's fair and reasoned judgment on the issue. Pl.'s Resp. at 17.

Defendants rely solely on the declaration of Paul Kirisitz, current Director of the Division of Program Implementation at ACF, who refers to ACYF–PA–83–01 as evidence demonstrating that ACF's policy of cost allocation between all benefitting programs was enforced as early as 1982.

Moreover, Mr. Kirisitz stated that he had "not been aware of any different views within the agency" about whether training costs must be allocated on an all-benefitting-program basis. A.R. 320. Yet, the administrative record contains a 1995 e-mail message to Mr. Kirisitz advising him that in 1993, others within the agency had knowingly accepted California's practice of charging training costs directly to Title IV–E as the primary benefitting program. A.R. 763. Thus, defendants are incorrect in implying that the current ACF training cost policy was "being enforced" every-

where except Nebraska in 1993. *See* Defs.' Mot. at 24.

The Court notes that the Commissioner's 1985 interpretation is not inconsistent with the interpretation embodied in the agency regulation. Moreover, the 1984 letter from the Director of the Office of Fiscal Operations at HHS to the Human Services Director at the New York Department of Social Services counsels the same position as the Commissioner's 1985 memorandum. In contrast to the 1984 letter and the 1985 memorandum, the 1987, 1990, and 1991 ACF transmittals represent a change in HHS's interpretation regarding the primary program approach. The DAB's decision allowing ACF to make such a fundamental change in its interpretation of the regulation undermines the APA requirements.[9]

Because the agency's authoritative interpretation of a regulation has changed without the opportunity for notice and comment, the agency has disregarded its requirements under the APA. Thus, this Court finds the changed interpretation invalid. Because the Court finds in Nebraska's favor on the issue of law, the Court has fully resolved the issue of the approvability of Nebraska's disputed CAP provision and this issue need not be remanded for further review.

**D. The Agency Is Not Required To Allow Primary Program Allocation Because It Has Allowed It In Other Contexts.**

 If an agency has failed to consider an important aspect of the problem,

9. Defendants argue that in *Arizona v. Shalala,* this court held that requiring states to use the benefitting program method of allocation was neither a "drastic change" nor a "radical departure" from the agency's prior position of allowing the primary program method in a limited context, and thus, notice and comment was not required. 121 F.Supp.2d 40, 51 (D.D.C.2000). However, *Arizona v. Shalala* was reversed on appeal because the D.C.

Circuit found that in the years prior to the 1998 HHS issuance involved in the case, HHS had interpreted OMB Circular A–87 as not independently constraining the agency to require allocation to all benefitting programs if a program's governing statute permitted a primary program approach. *See Arizona v. Thompson,* 281 F.3d 248, 258–59 (D.C.Cir. 2002). Thus, the district courts opinion in *Arizona v. Shalala* is not instructive.

then the agency's action is arbitrary and capricious. *See Puerto Rico Higher Educ. Assistance Corp. v. Riley,* 10 F.3d 847, 850 (D.C.Cir.1993). Here, plaintiff argues that the DAB acted arbitrarily and capriciously because it gave little or no consideration to Nebraska's fairness arguments.

The DAB has, in the past, allowed states to allocate costs to one program, even though other programs benefit, if the cost was incurred to fulfill a legal requirement. *Indiana Dept. of Public Health,* DAB Decision No. 150, 1981 HHSDAB LEXIS 761 (1981). Plaintiff argues that Nebraska has shown that from the inception of Title IV–E, ACF's position has been that "[t]o ensure the availability of essential skills, staff training must be an important element of the State agency's management plan." 45 Fed.Reg. 86,817 (Dec. 31, 1980). Plaintiff has also shown that the training it has designed and delivered is specifically geared to satisfy Title IV–E requirements. Thus, plaintiff argues that under the *Indiana* rationale, the DAB should have rejected ACF's blanket prohibition against the assignment of Nebraska's foster care training costs to Title IV–E.

Moreover, in non-training cost allocation cases, the DAB has allowed costs to be allocated to a program if the activity funded by the costs has a positive financial impact on the funding program. *See Rhode Island Substance Abuse Prevention Task Force Assoc.,* DAB Decision No. 1681, 1999 HHSDAB LEXIS 5 (1999). Nebraska argued that under HHS regulations, a percentage of the state's Title IV–E funding for administrative costs is subject to forfeiture if ACF determines that the state is out of conformity with the requirement for staff training. *See* 45 C.F.R. §§ 1355.33(b)(1) and 1355.36(b)(4) (2002). Therefore, plaintiff argues that its training program for PSWs is necessary to

protect the state's allotment of Title IV–E administrative funding.

In addition, plaintiff cites the comments submitted by other state Title IV–E agencies in response to a request for comment concerning the implementation of Title IV–E. These commenters explained that workers who handle primarily Title IV–E cases and workers who handle only a few Title IV–E cases require the same training. *See* 61 Fed.Reg. 43,250 (August 21, 1996). Plaintiff argues that all PSWs benefit from the training they receive and that training may actually help prevent children from becoming recipients under Title IV–E. A.R. 797–902, A.R. 949–56. Plaintiff argues that these comments show why it is fair to allocate training costs to Title IV–E even if the PSWs spend significant portions of their time on non-Title IV–E cases.

The DAB has upheld states' allocation of training costs on a primary-benefitting program basis for other government programs. *See New Mexico Human Servs. Dep't,* DAB Decision No. 382, HHSDAB LEXIS 955 (1983)(holding that training costs for Title XX could be directly charged to Title XX even though not all trainees were involved in the Title XX program).

Although the DAB has the authority to permit primary program allocation, its willingness to do so in other contexts does not compel its hand here. While it is uncontested that Nebraska's PSWs would benefit from additional training, there is a limited amount of federal dollars and the agency is charged with distributing it in the fairest method possible. The DAB has been clear that it would fully fund Title IV–E training for PSWs who handle only Title IV–E cases. For all other PSWs, Title IV–E will pay a percentage of the Title IV–E training which corresponds to the percentage of Title IV–E cases a par-

ticular PSW has or the percentage of time a particular PSW spends on Title IV–E cases. The DAB considered Nebraska's fairness arguments and found them unpersuasive. The DAB's action in this regard is not arbitrary and capricious.

**E. Even If Nebraska Had An Approved CAP That Permitted It To Allocate All Foster Care Training Costs Exclusively To Title IV–E, After Nebraska Received Notice That This Was No Longer Permitted, The Formerly Approved CAP Does Not Entitle Them To Continue To Do So.**

 Defendants assert that they mistakenly approved Nebraska's CAP in 1993, which included a provision allocating costs for training solely to Title IV–E. DCA attempted to rectify the situation in 1996 by requiring Nebraska to change the provision and begin allocating costs to all the benefitting programs. Defs.' Mot. at 31. Nebraska submitted a new CAP in 1997 that was drafted in a manner so as to arguably support an interpretation that the method it employed under the 1993 CAP was still permitted. *Id.* Nebraska continued to direct charge Title IV–E exclusively. *Id.* Defendants argue that Nebraska should not be permitted to interpret its 1997 CAP as allowing for training costs to be allocated solely to Title IV–E because Nebraska was specifically advised that this was not acceptable.

Nebraska has argued before the DAB that because there have been no intervening changes in law or policy since its approved CAP, the CAP should remain in effect. As authority for this argument, Nebraska cited language from the *Illinois* decision, "[o]nce approved by the DCA, a CAP may continue in effect indefinitely if that state submits an annual statement to DCA certifying that the CAP is not outdated." DAB Decision at 11 (A.R. 11, quoting *Illinois* at 4). However, the 1993 CAP was superseded by the 1997 CAP, which was submitted after Nebraska was on notice that primary program allocation was impermissible. No change in policy was required because the agency found that the 1993 CAP was inconsistent with existing law and policy. Yet, even if the 1993 CAP was in effect, DCA is still not required to approve Nebraska's new CAP. The DAB has held that DCA may require a state to change its cost allocation method on a prospective basis. *See Oklahoma Dep't of Human Services,* DAB No. 963 (1988).

Moreover, a state is required to amend its CAP if a material defect is found. 45 C.F.R. § 95.509(a)(2). Thus, DCA's prior approval of the 1993 CAP, does not require the DCA to permit Nebraska to continue allocating costs as prescribed by that CAP.

**F. The DAB Considered Nebraska's Remaining Arguments And Rejected Them.**

 Under the APA's arbitrary and capricious standard, the agency's decision regarding the remaining arguments evinces a "rational connection between facts found and choices made" and shall be affirmed. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Inc. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). The D.C. Circuit has held that "the arbitrary and capricious standard [of the APA] is a highly deferential one which presumes the agency's action to be valid and which mandates judicial affirmance if a rational basis for the agency's decision is presented even though [the court] might otherwise disagree." *Environmental Defense Fund, Inc. v. Costle,* 657 F.2d 275, 283 (D.C.Cir.1981). It appears to the Court that the DAB considered each of plaintiff's arguments and provided a rationale for why each was rejected. A review of DAB Decision 1882 shows a rational connection between the facts of the case

and the decision with regard to the remaining arguments.

Nebraska asserts that it demonstrated that allocating training costs on the basis of caseload or time studies is inequitable. Nebraska claims that it reminded the DAB of Congress' purpose in enacting Title IV–E and directed the DAB to several comments by social work professionals explaining why it was inequitable to reduce the level of Title IV–E funding, through cost allocation, where the Title IV–E caseload is small in relation to the overall child welfare caseload. A commenter from the Southwest Texas State University noted that "it just doesn't make sense to count children in [Title IV–E] foster care [as a basis for allocating costs] when the goal is to get children out of foster care." A.R. 826. Similarly, a commenter from UCLA stated, "When FFP is calculated on a system allocated according to the state-wide number of children in foster care, states whose agencies fail at keeping children at home will reap the highest FFP." A.R. 860.

The DAB was not persuaded that caseload or time studies were inequitable. The DAB responded that while training might help keep children out of foster care "there are certainly other factors that could affect the IV–E caseload. Thus, the potential for training to reduce the Title IV–E caseload does not in your view invalidate the use of caseload to measure the extent of benefit to each participating program." DAB Decision at 24 (A.R.24).

In addition, Nebraska argued that the State is entitled to make a business decision about which program, Title IV–B or Title IV–E, should be charged for the cost of training. The DAB rejected that argument and found that there needs to be an agreement between the two programs if cost shifting were to be permitted. Nebraska claims that because Title IV–E and Title IV–B are administered by the same agency, there is no need for a program agreement. However, Nebraska has no basis for its argument that a state can decide whether it charges training costs to Title IV–B or Title IV–E. As the DAB explained, states can only shift costs when they have specific authority in the form of a program agreement. There is no such agreement in place for these two programs.

Finally, the DAB acknowledged that Title IV–E regulations authorize the withholding of 10% of a state's claim for administrative costs if the state is not in substantial conformity with training requirements. DAB Decision at 22 (A.R.22). Having addressed this argument in *New York State Office of Children and Family Services*, DAB No. 1707 (1999), the DAB noted that HHS could deny Title IV–E funding for efforts related to children who were not in Title IV–E as long as the State had notice. DAB Decision at 22–23 (A.R.22–23). After 1993, neither party has disputed that Nebraska had notice of the policy. Thus, the DAB's decision in this regard was not arbitrary and capricious.

## V. Conclusion

Upon consideration of the Cross Motions for Summary Judgment, the Responses, and Replies thereto, the Supplemental Memorandums, the entire record in this case, the governing statutory and case law and for all the reasons stated in this Memorandum Opinion, Plaintiff's Motion for Summary Judgment is **GRANTED** and Defendants' Motion for Summary Judgment is **DENIED**. Following the precedent of this Circuit in *CropLife America v. EPA*, 329 F.3d 876 (D.C.Cir.2003), the Court will vacate the substantive rule and interpretive rule announced in ACYF–PA–87–05, ACYF–PA–90–01, and ACF–IM–

91–15. The agency's previous practice of allowing primary program allocation is reinstated and remains in effect unless and until it is replaced by a lawfully promulgated regulation.

A separate Order and Judgment accompanies this Memorandum Opinion.